DETROIT EDISON COMPANY *v.* CITY OF WIXOM.

OPINION OF THE COURT.

1. PUBLIC SERVICE COMMISSIONS—PLENARY POWER—REGULATIONS—ZONING ORDINANCES.

The principle of plenary supremacy of the public service commission over electric service utilities within the State is not controlling where the commission requires towers for a proposed electric line to average 132 feet high, but a city ordinance of the municipality through which the proposed line is to pass limits tower height to 100 feet.

2. SAME—TRANSMISSION OF ELECTRICITY—REGULATION—INTEREST—ZONING ORDINANCE—LAND USE.

The public service commission has an interest in height regulations for electric line towers only as it relates to the safety of the proposed line, the capacity of the line, the need for the line, and its total relation to the maintenance of electrical service to the people of the multi-county area, while a city has an interest in location and route of high tension power lines as it involves a specific land use which is not compatible with other land uses and characterizes the neighborhood and influences the development of adjacent real estate.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4–7, 18, 21] 43 Am Jur, Public Utilities and Services § 193 *et seq.*
[3] 43 Am Jur, Public Utilities and Services § 218.
[8] 5 Am Jur 2d, Appeal and Error § 822.
[9] 58 Am Jur, Zoning § 14.
[10] 58 Am Jur, Zoning § 146 *et seq.*
[11, 14] 58 Am Jur, Zoning §§ 2, 19.
[12] 16 Am Jur 2d, Constitutional Law § 144 *et seq.*
[13] 58 Am Jur, Zoning § 147.
[15] 5 Am Jur 2d, Appeal and Error § 1009.
[16] 58 Am Jur, Zoning § 18.
[17] 58 Am Jur, Zoning §§ 21, 22.
[19] 58 Am Jur, Zoning § 149.
[20] 58 Am Jur, Zoning § 30.

3. SAME—TRANSMISSION OF ELECTRICITY—REGULATIONS—CONSTITUTIONAL LAW—DUE PROCESS—HEARINGS.

Determination of height regulations for high tension electrical power lines by the public service commission which would be binding on local units of government would suggest due process shortcomings in absence of public hearings and notification to affected municipalities.

4. MUNICIPAL CORPORATIONS—TRANSMISSION OF ELECTRICITY—ZONING ORDINANCE.

A city cannot prevent the construction of all high tension electric lines any more than it can bar the conduct of any other legitimate enterprise.

5. PUBLIC SERVICE COMMISSIONS — STATUTES — PUBLIC UTILITIES — TRANSMISSION OF ELECTRICITY — REGULATION.

Public service commission is vested with complete power and jurisdiction to regulate all public utilities in the State, except as otherwise restricted by law, but is not vested with authority to determine routes of high tension lines except as those routes bear upon rates, fares, fees, charges, services, rules, and conditions of service or formation, operation, or duration of such public utilities (CLS 1961, § 460.1 et seq.).

6. SAME—PUBLIC UTILITY—MUNICIPAL CORPORATIONS—ELECTRICITY—ROUTE DETERMINATION—ARBITRATION.

The public service commission is not empowered to assume the rôle of arbiter between a utility and a city in a dispute over the route for high tension electric power lines, for the utility company's cost-conscious approach to route selection and the commission's rate-and-service-conscious evaluation of the selected route are too closely aligned.

7. ZONING — MUNICIPAL CORPORATIONS — PUBLIC SERVICE COMMISSIONS — ELECTRICITY — PUBLIC POLICY.

The zoning law empowers cities to make reasonable regulations which apply to electric utilities, for even though the public service commission represents all people in their capacity as users of electricity, public policy is broader than the public interest in adequate electric service and the city represents people in their multiple concerns as members of a local community (CL 1948, § 125.581 et seq.).

SEPARATE OPINION.

T. E. BRENNAN, C. J., and KELLY, J.

8. COURTS—EQUITY—RECORD.

*The Supreme Court has clear authority to decide an equitable action upon the record made in lower courts (GCR 1963, 865.1[7]).*

9. ZONING—ORDINANCES—CONSTITUTIONAL LAW—APPLICATION.

*A city zoning ordinance, although valid on its face, may be constitutionally infirm as it applies to specific land.*

10. SAME—CONTINUANCE OF NONCONFORMING USES.

*Continuance of lawful nonconforming uses of land may be provided for as exceptions to a municipal zoning ordinance (CL 1948, § 125.583a).*

11. SAME—VESTED INTERESTS IN LAND.

*Zoning laws may not deprive owners of land of vested interests therein without just compensation (US Const, Ams 5, 14; Mich Const 1963, art 1, § 17).*

12. STATUTES—CONSTRUCTION—CONSTITUTIONAL LAW.

*The Supreme Court always interprets a statute to be constitutional if it admits of a constitutional interpretation.*

13. ZONING—CONTINUANCE OF NONCONFORMING USE—CONSTRUCTION OF STATUTES.

*Use of land exactly as such existed, as term is used in provision of statute permitting continuance of nonconforming use as an exception to zoning ordinance, is not in conflict with constitutional principle that owners of vested rights in land may not be deprived of such rights without just compensation (US Const, Ams 5, 14; Mich Const 1963, art 1, § 17; CL 1948, § 125.583a).*

14. SAME—NONCONFORMING USE—VESTED RIGHTS.

*Mere investment in the acquisition of land for an intended nonconforming use under zoning ordinance is not sufficient to create a vested right, but where the acquisition is an integral part of a contiguous land use, such as a right-of-way for a high tension electric line, the investment is substantial, made in good faith, and there is partial construction, the owner will be protected by injunction against subsequent prohibition of the use (US Const, Ams 5, 14; Mich Const 1963, art 1, § 17).*

15. Costs — Public Question — Injunction — Public Utility — Municipal Corporations — Zoning.

No costs are allowed upon remand to circuit court for entry of an injunction against enforcement of a city zoning ordinance passed to prevent plaintiff power company from constructing high tension towers through defendant city, a public question being involved.

16. Zoning — Public Welfare — Police Power — Ordinances — Reasonableness.

Zoning ordinances related to public health, morals, safety, or general welfare are a valid exercise of police power, provided such ordinances satisfy the legal test of reasonableness.

17. Same—Ordinances—Validity—Reasonableness.

Reasonableness of a zoning ordinance and its consequent validity or invalidity must be determined on its own facts and surrounding circumstances.

18. Same—Ordinance—Public Utility—Retroactive Ordinance—Vested Property Rights.

Hurriedly adopted amendment of city's zoning ordinance prohibiting structures within the city in excess of 100 feet in height, thereby restricting plaintiff electric company to use of a 120 kv electric system in that city, held, invalid as being retroactive in that plaintiff had purchased land, made commitments for the purchase of towers, lines, and station equipment, and secured approval of the public service commission for construction of a 345 kv electric system through defendant city before adoption of the amendatory ordinance.

19. Same—Ordinance—Property Rights.

Amendatory zoning ordinance of a city prohibiting structures in excess of 100 feet in height, thus forcing plaintiff electric company to abandon its proposed 345 kv electric system which would require 130-foot towers and for which plaintiff had already acquired property which was not adaptable to any other system, held, invalid, as zoning ordinances which render property almost worthless are unreasonable and confiscatory.

20. Same — Ordinance — Public Welfare — Aesthetic Consideration.

Zoning ordinance which bears no substantial relationship to present public health, safety and morals, or general welfare but is adopted purely for aesthetic reasons or unsupported

fears of city planners is invalid, though aesthetics may be a valid consideration, where not the moving factor but merely incidental to enactment of the ordinance.

See headnote 15.

Separate Opinion.

Black, J.

21. Public Service Commissions—Transmission of Electricity—Route Approval—Zoning Ordinances—Administrative Authority.

*Public service commission's approval of electric company's plans and specifications for construction of transmission lines, worded in the language of a statutorily authorized regulation of the commission which is broad enough to exact compliance with constitutional and statutory requirements pertaining to local franchises as well as requirements of a legal nature, including all validly applicable zoning regulations, indicate the commission chose to limit its exclusive authority to regulate construction and maintenance of electric transmission lines and thus not pre-empt local ordinances (Const 1963, art 7, §§ 19, 25, 29, 30; CLS 1961, § 460.1 et seq.).*

Appeal from Court of Appeals, Division 2, T. G. Kavanagh, P. J., and J. H. Gillis and McGregor, JJ., reversing and remanding Oakland, Adams (Clark J.), J. Submitted December 4, 1968. (Calendar No. 25, Docket No. 51,983.) Decided December 1, 1969.

10 Mich App 218, reversed.

Complaint by Detroit Edison Company, a foreign corporation, against City of Wixom, to enjoin enforcement of zoning ordinance and to have it declared void. Injunction granted. Defendant appealed to Court of Appeals. Reversed and remanded. Plaintiff appeals. Reversed and remanded for issuance of injunction,

*Fischer, Sprague, Franklin & Ford (Leon R. Jones* and *Ralph H. Houghton, Jr.,* of counsel), for plaintiff.

*Schnelz & Bulgarelli (Louis C. Andrews, Jr.,* of counsel), for defendant.

T. E. Brennan, C. J.

### The Case.

This is not an easy case to state. It involves the growing conflict between the needs of a sprawling megalopolis and the rights of a single community.

It represents one facet of the late-20th century dilemma: How to balance the demands of vast new urbanization and the demands of people for local determination of their own environment.

Recently, this Court ended a decade of controversy over the location of an interstate highway.[1] In this case of Wixom and the Detroit Edison Company, we decide another "routing" controversy. The history of the lawsuit is in the opinion of the Court of Appeals.[2]

### The Facts.

The plaintiff, Detroit Edison Company, is a public utility engaged in generating and supplying electric energy throughout southeastern Michigan. It is substantially the only source of electricity for an area of 7,600 square miles, containing more than half the population of the State. Its electricity is generated principally at a series of power plants

---

[1] *City of Pleasant Ridge* v. *Governor (Di Matteo* v. *State Highway Commission, City of Lathrup Village* v. *Department of State Highways),* 382 Mich 225.

[2] *Detroit Edison Company* v. *City of Wixom* (1968), 10 Mich App 218 (74 PUR3d 189).

along the Detroit and St. Clair rivers, and is supplied to the area by a system of transmission lines.

Defendant, city of Wixom, is a home-rule city. Its area is about eight square miles. The 1960 census showed a population of 1,531. Today, there are about 2,500 inhabitants.

Every square foot of the area served by Detroit Edison is part of some municipal corporation—about 250 townships and 500 cities and villages. Each local community has authority to adopt zoning ordinances.

For several years before the filing of this action, the demand for electrical energy in southeastern Michigan had been increasing. Edison had been expanding its facilities. Before 1956, Edison determined to add to its capabilities by constructing an extra high voltage transmission line from its St. Clair plant to its Monroe plant. The line is described as the future backbone of southeast Michigan's electrical system, tying into the Canadian system at the north, and the Ohio-Indiana system on the south. Under safety regulations adopted by the Michigan public service commission, the towers supporting these lines must be 130 feet high, or higher.

Before the construction of the Ford Motor Company's Wixom plant, the area was part of Novi township. In 1957, Wixom became a village. Fifteen months later, it became a city. Rapid growth was predicted. A planning consultant was employed, a master plan adopted, a zoning ordinance passed.

But Wixom's population explosion has failed to materialize. For one thing, large areas of the city have poor soil conditions. Sewers are needed, before housing can be constructed. Thoroughfares and rail lines virtually divide the city into small land pockets.

The actual selection of the route was made by Edison in 1955 and 1956. The route was chosen by an Edison employee, after aerial photographs disclosed pertinent population conditions and topographical factors.

Most of the route selected passes over rural property, but the northerly mile of the line splits the city's only residential subdivision, and spans Loon Lake, its only sizeable body of water.

Edison did not consult Novi township before deciding on its route, or before proceeding to acquire its right-of-way. Neither did Edison consult the city of Wixom after its incorporation. Edison did apply to the Michigan public service commission for commission approval of the project. This was in October of 1964. Edison's right-of-way through Wixom is four miles long, 200 feet wide. It was acquired at a cost of $273,000.

Wixom was not notified of the pending application. No hearing was held. On November 13, 1964, the commission approved Edison's plans to construct the power line.

The approval pertained only to the character of the construction and did not confer any rights to carry out construction until all necessary local franchises, permits, and authorizations were secured.

On June 8, 1965, the Wixom city council amended the city's zoning ordinance to prohibit utility towers in excess of 100 feet high. The amendment also prohibited all overhead and underground lines intended primarily to service areas outside the city. The city's zoning board of appeals was empowered to approve such installations only after considering the injurious effects of such installations on abutting property and on the orderly appearance of the city.

The ordinance amendment was declared to be an emergency amendment and was given immediate

effect.  The amendment was intended to control the location of high tension power lines of the type involved here.  The trial judge found, and the record supports the finding, that the amendment was aimed at halting the construction of this particular high tension line through the city of Wixom.

A substantial portion of the line was already completed when the ordinance was amended on June 8, 1965.  Edison has expended in excess of $2,400,000 on the St. Clair-to-Monroe line.  It began buying land in Wixom around 1956 and was still acquiring real estate there in 1959 and 1960.

Prior to June 8, 1965, the construction of an ultra-high-voltage line on the Wixom property was not prohibited.  Even in the residential zones, such facilities were permitted.

This action was commenced 15 days after the adoption of the ordinance amendment.  Edison made no application to the zoning board of appeals for a permitted variance.

### First Issue: Pre-emption.

Edison argues that it cannot serve two masters. Because of the size and capacity of the proposed line, the Michigan public service commission requires towers averaging 132 feet high.  By its ordinance, the city limits tower height to 100 feet. Citing *Detroit Edison Company* v. *Corporation & Securities Commission* (1962), 367 Mich 104, Edison argues the principle of plenary supremacy of public service commission control over Michigan electric service utilities.

The principle which controlled that *Edison Case* does not apply to this one.  That case involved the question of whether certain reserves for income taxes were appropriately regarded as surplus.  We held that surplus for rate-base purposes and surplus

for tax-base purposes could not be distinguished; that the case presented a picture of administrative whipsaw; and that the Michigan public service commission determination was controlling.

In this case, there is a difference between the functions of the height regulations of the public service commission and the height regulations of the city. The commission's interest is in "the character of the construction" as it relates to the safety of the proposed line, the capacity of the line, the need for the line, and its total relation to the maintenance of electric service to the people of southeastern Michigan.

The commission is not interested—nor should it be—in the effect which the construction will have on the development of the communities through which it passes. If its determination were to be binding upon local units of government, the absence of public hearings and notification to affected municipalities would suggest due process shortcomings.

The city, on the other hand, has a legitimate though narrow area of concern. It cannot prevent the construction of all high tension lines, any more than it can bar the conduct of any other legitimate enterprise. *Gust* v. *Township of Canton* (1955), 342 Mich 436.

But a city does have an interest in the location and route of a high tension electric power line. It is a specific land use which is not compatible with other land uses. It is a land use which characterizes the neighborhood and influences the development of adjacent real estate.

The public service commission statute does not vest the commission with authority to determine the routes of high tension lines except as those routes

bear upon "rates, fares, fees, charges, services, rules, conditions of service" or the "formation, operation or direction of such public utilities." CLS 1961, § 460.1 *et seq.* (Stat Ann 1965 Cum Supp § 22.13[1] *et seq.*). The first sentence of CLS 1961, § 460.6 (Stat Ann 1965 Cum Supp § 22.13[6]), vests the commission "with complete power and jurisdiction to regulate all public utilities in the state * * * except as otherwise restricted by law."

The commission is not empowered to assume the role of arbiter between the utility and the city. The company's cost-conscious approach to route selection and the commission's rate-and-service-conscious evaluation of the selected route are too closely aligned.

Public policy is broader than the public's interest in adequate electric service. The commission represents all of the people in their capacity as users of electricity; the city represents some of the people in their multiple concerns as members of a local community.

The majority opinion of the Court of Appeals correctly analyzed the pre-emption argument, and concluded that the zoning law (CL 1948, § 125.581 *et seq.*, as amended [Stat Ann 1958 Rev § 5.2931 *et seq.*]) empowers cities to make reasonable regulations which apply to electric utilities.

SECOND ISSUE: VALIDITY OF THE ORDINANCE.

Since the trial judge found for Edison on the issue of pre-emption, he did not discuss the wider question of the constitutional validity of the ordinance as it applies to the property of the Edison Company.

The Court of Appeals chose to remand the issue.

We do not. This litigation has been too long in the courts, and our authority to decide this equitable action upon the record made below is too clear.

GCR 1963, 865.1(7); *Hungerford* v. *Township of Dearborn* (1960), 362 Mich 126, 132; *Keller* v. *Township of Farmington* (1959), 358 Mich 106, 111.

An ordinance although valid on its face may be constitutionally infirm as it applies to specific land.

For the purpose of constructing its high tension line Edison acquired about 40 miles of right-of-way from St. Clair to Pontiac and constructed 264 towers and installed 250 miles of conductors at a cost of over $3,600,000. Further, Edison acquired about 44 miles of right-of-way from its Wayne station to Pontiac, including the 4 miles in the city of Wixom. The cost of this 44-mile segment was over $2,400,000.

It is difficult to consider or treat the 4-mile-long, 200-foot-wide Edison right-of-way in Wixom as an isolated parcel of land. This tract is inextricably tied to the entire right-of-way.

Without the Wixom land, the use of the balance of the right-of-way is frustrated. Only with the Wixom land can the entire right-of-way be used.

Our zoning law provides an exception for nonconforming uses (CL 1948, § 125.583a [MCLA § 125.583a, Stat Ann 1958 Rev § 5.2933(1)]):

"Sec. 3a. The lawful use of land or a structure exactly as such existed at the time of the enactment of the ordinance affecting them, may be continued, except as hereinafter provided, although such use or structure does not conform with the provisions of such ordinance."

This statute as originally enacted, PA 1921, No 207, provided for removal of nonconforming uses, without compensation to the owners. It was constitutionally invalid. OAG 1947–1948, No 146, p 217.

Zoning laws may not deprive owners of land of vested interests therein without just compensation.

US Const, Am 5, and Am 14 § 1; Mich Const 1963, art 1, § 17.

The statute quoted above must be read in the light of constitutional mandates, and this Court always interprets a statute to be constitutional if it admits of a constitutional interpretation. *Cady* v. *City of Detroit* (1939), 289 Mich 499.

Therefore, the statutory phrase "exactly as such existed" cannot be held to conflict with the constitutional principle concerning vested rights.

Thus there is a body of case precedent in which nonconforming uses are found to exist based upon the investment of money and the change of a proprietor's position in reliance upon existing regulations or nonregulation.[3] *Adams* v. *Kalamazoo Ice & Fuel Co.* (1928), 245 Mich 261.

Mere investment in the acquisition of the land for an intended use is not sufficient to create a vested right. But where, as here, the acquisition is an integral part of a contiguous land use (here a right-of-way), and substantial investment (here over $6,000,000), in a total, unitary usage has been made in good faith, including partial construction thereof (here a partly completed high tension line), then the rights of the owner are vested, and will be protected against a subsequent prohibition of the use.

Cases like *Patchak* v. *Township of Lansing* (1960), 361 Mich 489, are to be distinguished. In *Patchak*, there was a trailer park established for many years upon 5 acres of a 15-acre tract. Extension of the nonconforming use to the balance of the tract was prohibited. There the trailer park was a complete and operative use on the 5 acres. The ad-

---

[3] See, also, *Expert Steel Company* v. *City of Clawson* (1962), 368 Mich 619; *De Mull* v. *City of Lowell* (1962), 368 Mich 242; *City of Coldwater* v. *Williams Oil Co.* (1939), 288 Mich 140; *Sandenburgh* v. *Michigamme Oil Co.* (1930), 249 Mich 372; *Gruber* v. *Mayor and Township Committee of Raritan* (1962), 39 NJ 1 (186 A2d 489).

ditional 10 acres were requested for an extension of the smaller, original use.

In this case of Edison, there is no smaller original use, complete and operative on adjoining land. There is only the single contemporaneous use as a high tension line, stretching from Monroe to St. Clair.

The operation of the line in the 40-mile segment from St. Clair to Pontiac is not a use which is complete in and of itself. It is analogous to the occupancy of the first floor of a multifloor apartment which is still under construction. The high tension line here is a continuous use of land, to which Edison's right of use was vested before June 8, 1965, the date of the binding ordinance.

The Court of Appeals is reversed to this extent: that upon remand the circuit court shall enter an injunction as prayed for by the plaintiff in accordance with this opinion.

No costs, a public question being involved.


Kelly, J., concurred with T. E. Brennan, C. J.


T. M. Kavanagh, J. We concur in the opinion of Chief Justice T. E. Brennan as to the first issue and the result reached on the second issue. On the latter issue we concur in the result reached for the following reasons:

The legal principle is firmly established that zoning ordinances, when related to the public health, morals, safety, or general welfare, are a valid exercise of the police power, provided that such ordinances satisfy the legal test of reasonableness. *Roll v. City of Troy* (1963), 370 Mich 94; *Township of West Bloomfield v. Chapman* (1958), 351 Mich 606; *Anderson v. City of Holland* (1956), 344 Mich 706; *McGiverin v. City of Huntington Woods* (1955), 343

Mich 413; *Janesick* v. *City of Detroit* (1953), 337
Mich 549; *City of North Muskegon* v. *Miller* (1929),
249 Mich 52. It is equally well established that each
case involving the reasonableness of a zoning ordi-
nance and its consequent validity or invalidity must
be determined on its own facts and surrounding cir-
cumstances. *Korby* v. *Township of Redford* (1957),
348 Mich 193; *Long* v. *City of Highland Park*
(1949), 329 Mich 146; *Moreland* v. *Armstrong*
(1941), 297 Mich 32; *Pere Marquette R. Co.* v. *Mus-
kegon Township Board* (1941), 298 Mich 31.

Turning to the facts of this particular case to de-
termine the reasonableness of the ordinance in ques-
tion, we note the peculiar dilemma in which Detroit
Edison, as a public utility, is placed.

As a public utility, it was not only desirable but
incumbent upon Detroit Edison to anticipate and
provide for the ever-increasing customer demand
for electricity by expanding its system of high-
voltage transmission. In the discharge of its duty
and absent any countervailing statute or zoning or-
dinance, the most feasible method of expansion in
terms of technology and economics was to erect a
345 kv[1] system. Proceeding under this system, the
public utility would be required, pursuant to safety

---

[1] To assist the reader in understanding the technical problems, the
following testimony is pertinent:

"*Q.* If you will tell us about this lower voltage and higher voltage.
Most of your transmission lines, most of your tower lines are operat-
ing at present at what voltage?

"*A.* 120kv.

"*Q.* 120 kv. The line which is in question here, if it is built, is
intended to operate at what voltage?

"*A.* 345 kv.

"*Q.* What is the difference?

"*A.* It is about three times higher in voltage level and about eight
times greater in transmission capacity. * * *

"*Q.* Is there any difference in the mechanical construction of the
power line as between 345 kv and 120 kv?

"*A.* Not in basic concept but in physical details it has to be higher
because the voltage is higher and the clearance between conductors
and the steel and between conductors one to the other on the various
phases and above ground has to be greater."

regulations adopted by the Michigan public service commission, to construct towers approximately 130 feet in height.

On the other hand, the city's amendatory ordinance would prohibit structures in excess of 100 feet. This, in effect, restricts Detroit Edison to utilizing a 120 kv system.[2] The intent of the city in imposing this restriction is well summarized in the trial court's opinion, as follows:

"The city however does not look with favor upon the proposed construction. Speaking for the city, the planner says that it would physically divide areas zoned for future residential use, that it would prevent the orderly development of street systems, that it has a 'scare' effect on prospective home buyers and that the line of towers would be offensive in appearance."

Had this ordinance been in effect at the time Detroit Edison had initiated its long-term planning in 1956 and before its undertaking of the expansion of the existing facilities, all the parties undoubtedly would have recognized this presumptively valid ordinance as binding and would have acted accordingly.

The facts of this case, however, indicate that the amendatory ordinance, adopted in June of 1965,

---

[2] The practical effect of the ordinance upon plaintiff's project is disclosed by Detroit Edison's transmission engineer as follows:

"Q. Now this city ordinance limiting towers to 100 feet, would it be possible to construct legally or let me change that, would it be possible to construct in compliance with the code this transmission line if the towers were no more than 100 feet high?

"A. It would be possible but it would be very difficult.

"Q. What kind of thing would be involved?

"A. Well, if we wanted to transmit the same amount of power that we are going to carry on this line, we'll have to change the type of structure and to accommodate two circuits we'd require two separate tower lines.

"Q. Would it require perhaps more towers?

"A. It would require double the number of towers and at least 100 feet more right-of-way than we now have."

came long after the initiation of the project and purchase of the land by Detroit Edison in 1956. It was only after Detroit Edison had secured approval of the project from the Michigan public service commission in November of 1964 and was ready to commence its construction, that the city hurriedly adopted the amendatory ordinance. Furthermore, the ordinance was enacted after Detroit Edison had expended approximately $273,000 to purchase land measuring 200 feet in width and 4 miles in length through the city of Wixom. The record also discloses that Detroit Edison had made commitments for the purchase of necessary towers, lines, and station equipment totaling approximately $25,000,-000.

Considering the operational function of a public utility and the necessity for comprehensive long-term planning[3] and based upon the facts in this rec-

_____

[3] The nature and scope of plaintiff's operational expansion is disclosed by the testimony of the systems development manager:

"*Q.* What is the business of The Detroit Edison Company?

"*A.* Supplying the electric power requirements of the customers in the area it serves.

"*Q.* What is its area?

"*A.* It's roughly an area about 50 miles east and west from the Detroit river, Canadian boundary, and about 150 miles north and south. It includes the thumb of the State of Michigan and the area underneath, down to and including Monroe.

"*Q.* Does it include most of Oakland county?

"*A.* It does, sir. * * *

"*Q.* Will you tell the court something about the time this involves here? Why are you concerned with what the situation will be in 20 years from now?

"*A.* We are going to serve the public efficiently at lowest cost. We must plan our expansion on an orderly basis. This means that each step must fit into a long-range pattern so that the net end result is a coherent, adequate system.

"*Q.* In things like putting in new generating plants and putting in new transmission lines are those things which involve anything considerable in the way of time?

"*A.* Yes, the generating plant takes about five years of initial conception to installation, and transmission lines in some instances take about the same amount of time, 4 to 5 years.

"*Q.* Coming to the line which is in question this morning, we are here as I understand it about a proposed transmission line going north and south through the city of Wixom. Will you tell us some-

ord, we find that plaintiff had acquired vested property rights prior to the enactment of the city's ordinance. Viewed in this chronological context, we must and do hold the ordinance to be invalid as applied to plaintiff in that said ordinance operates retroactively upon plaintiff's vested property rights and not *in futuro* as required by our previous decisions. See *Bane* v. *Township of Pontiac* (1955), 343 Mich 481; *Richards* v. *City of Pontiac* (1943), 305 Mich 666; compare with *City of Howell* v. *Kaal* (1954), 341 Mich 585; *City of Lansing* v. *Dawley* (1929), 247 Mich 394.

In addition, we note from the facts in this record that Detroit Edison, to comply with this particular zoning regulation, would be forced to abandon its proposed 345 kv system; and, if it was to proceed under the only remaining plan, to acquire a 100-foot wider right-of-way and install two separate lines with twice as many towers. The net effect, therefore, of the ordinance in question would be to render the property in its present state, measuring 200

---

thing about what that proposed line is to be like and why it is proposed to build it?

"*A*. Yes, and I think if I could use the chart it might help explain some of our developments in the past and how this fits into our future pattern. Thirty years ago, I stated earlier that our capacity requirements and power requirements have increased some seven-fold in the last 30 years, 30 years ago we put in our Trenton Channel plant south of Detroit and our Marysville plant north of Detroit. At that time, our 120 kv transmission system was relatively new and we built 120 kv lines from Marysville into the north side of Detroit and from Trenton Channel into the south side of Detroit. The loads out around Pontiac and Ypsilanti and Superior were going rapid [growing rapidly, sic?], so we built a line at that time from St. Clair to the Pontiac area and from there on around to the Ann Arbor-Superior area and tied it back to the Trenton Channel. That is the present line that runs through the south side of Wixom. That tie is needed to give reliability to these power centers. Now as the load has grown, we have had to tap that line a number of times. One of the fairly recent taps is the Cody step-down station near South Lyons and the other is the Hancock, which is a few miles east of here. These step-down systems feed the subtransmission system and are necessary to pick up loads like the Wixom plant for general public purposes."

feet wide and 4 miles long, wholly unadaptable to any practical use by plaintiff and virtually worthless on any market.

We have in the past repeatedly held that zoning ordinances which render property almost worthless are generally unreasonable and confiscatory. *Lincolnhol* v. *Village of Shoreham* (1962), 368 Mich 225; *Burrell* v. *City of Midland* (1961), 365 Mich 136; *Scholnick* v. *City of Bloomfield Hills* (1957), 350 Mich 187; *Fenner* v. *City of Muskegon* (1951), 331 Mich 732; *Grand Trunk Western R. Company* v. *City of Detroit* (1949), 326 Mich 387. Based upon the facts in this record and the authorities cited, we hold this ordinance to be invalid.

We note, further, that the very nature of the ordinance in question indicates that it "bears no substantial relationship to present public health, safety, morals or general welfare." *Roll* v. *City of Troy, supra,* p 97. The entire thrust of the ordinance and the single bone of contention between the litigants is not the route location but, rather, the height of the towers. In this context, the city's planning consultant testified as follows:

"*Q.* What is your objection to the structure?

"*A.* The structure from an esthetic standpoint is certainly undesirable in a residential neighborhood.

"*Q.* If the ordinance you helped draft is addressed only to structure?

"*A.* That's true.

"*Q.* It makes no attempt to prevent the company from owning the land?

"*A.* Not at all.

"*Q.* And the objection to the structure now is an esthetic one?

"*A.* I only say this is part of the objection to it.

"*Q.* What is the rest of the objection to the structure?

"*A.* I think there is a real scare value in a high
tension power line in a residential area. Whether
you say or not it has effect on interference with
radio or television doesn't concern me. I know that
it probably can be worked out so it won't but I don't
think people know this. I am certain they don't.
If you have talked to people that live near a power
line, you get this comment: 'We feel that it affects
the reception of our television set and it does this
and does that.' This makes this property less de-
sirable as residential property."

It may be conceded that, in implementing the plan
apparently contemplated by the framers of this
ordinance, aesthetics may be a valid consideration;
but such consideration must be merely an incident
and not the moving factor. *Wolverine Sign Works*
v. *City of Bloomfield Hills* (1937), 279 Mich 205;
*Hitchman* v. *Township of Oakland* (1951), 329 Mich
331. While we are not insensitive to the disruptive
and unsightly effect which the proposed towers and
lines may have upon the scenic beauty of the Wixom
area, we cannot sustain the ordinance for purely
aesthetic reasons or unsupported fears of the city
planners. The ordinance to the extent that it is
predicated upon an exclusively aesthetic basis is
held to be invalid.

For the reasons given above and based upon the
authorities cited herein, we hold the ordinance in
question to be invalid.

Upon remand the circuit court shall enter an in-
junction as prayed for by plaintiff in conformity
with this opinion.

No costs, a public question being involved.

DETHMERS, BLACK, and ADAMS, JJ., concurred with
T. M. KAVANAGH, J.

BLACK, J. (*concurring*). I agree with the reasoning and final conclusion reached by Justice T. M. KAVANAGH. In token thereof my signature has been affixed to his opinion.

I feel nonetheless that some attention should be given to the primary issue, the issue which formed the basis of our order granting leave. See 10 Mich App 218, 221. There the first paragraph of Judge J. H. GILLIS' opinion reads:

"The troublesome issue presented by this appeal is whether the legislature has granted exclusive authority to the public service commission to regulate public electric utilities so as to preclude a local government from attempting such regulation through its duly enacted zoning ordinances."

When the public service commission considered and approved plaintiff Edison's plans for construction of the St. Clair-Pontiac-Wayne Station transmission line, the commission wrote Edison (November 13, 1964):

"We find that your plans comply with this commission order 1868 and 1679, and the same have been approved. Enclosed please find one set of such plans marked with our approval. A duplicate set of plans is being retained in our files. This approval pertains only to the character of construction and does not confer any rights to carry out construction until all necessary local franchises, permits, and authorizations have been secured and all legal requirements have been complied with. The approval does not apply to any railroad crossings which may be involved in the proposed construction as separate permits are necessary for crossing railroad company tracks. The approval of your plans constitutes your authority for proceeding with the proposed construction insofar as the character of construction is concerned."

This language, employed as it is and has been by Edison's statutory superintendent, stems from a statutorily authorized regulation which the commission placed in effect many years ago.[1] The rule appears now in the 1954 State administrative code as R 460.584(4)(b) (p 5944):

"The approval of plans in accordance with the procedure herein set forth pertains only to the character of construction and does not confer any rights upon the applicant to carry out construction until all necessary local franchises, permits and authorizations have been secured and all legal requirements have been complied with."

The language of the rule, annexed as it was to the commission's approval of Edison's plans and specifications for construction of this transmission line, is broad enough to exact compliance not only with constitutional and statutory requirements pertaining to local franchises and permits but also with "all legal requirements" of a local nature. The phrase "all legal requirements" certainly would include and require compliance with all validly applicable zoning regulations.

The commission, well within the powers of superintendence and rule-making vested with it by statute, has in this instance chosen to limit what otherwise is clearly exclusive authority to regulate the construction and maintenance of heavy duty long distance electric transmission lines, controlled only as that authority is by constitutional restraints, notably those appearing in sections 19, 25, 29, and 30 of the seventh article, Constitution of 1963.[2]

---

[1] Rules and regulations promulgated by a statutorily authorized administrative agency have the force and effect of law. See *Columbia Broadcasting System* v. *United States* (1942), 316 US 407, 417–419 (62 S Ct 1194, 86 L Ed 1563) and discussion in *Douglas* v. *Edgewater Park Company* (1963), 369 Mich 320, 331, 332.

[2] Corresponding provisions in effect at the time involved in this case will be found in Const 1908, art 8, §§ 19, 25, 29, 30.—Reporter.

There accordingly is no present room for a holding that the commission intended that its said approval be pre-emptible of validly applicable local zoning ordinances. This is not to say that the commission may not so pre-empt. It is to say that the commission has not yet done so.

T. G. KAVANAGH, J., did not sit.