### TOWNSHIP OF BLOOMFIELD *v.* BEARDSLEE.

INJUNCTION—PUBLIC NUISANCE—GRAVEL PIT—RESIDENTIAL AREA—ZONING.

Gravel pit owners in land, zoned by township zoning ordinance for residential purposes, are enjoined from continuance of such use on ground that a very real and active public nuisance was established which should be abated, rather than the destruction or withholding of the right to secure subsurface substances from one's property, through zoning ordinances, unless very serious consequences follow therefrom.

Appeal from Oakland; Hartrick (George B.), J. Submitted October 11, 1956. (Docket No. 51, Calendar No. 46,762.) Decided July 31, 1957. Rehearing denied October 7, 1957.

Bill by the Township of Bloomfield, a municipal corporation, against Floyd Beardslee and others to enjoin violation of zoning ordinance and restrain removal of gravel. Cross bill by defendants contesting validity of ordinance as to their property. Decree for plaintiff. Defendants appeal. Affirmed.

---

REFERENCES FOR POINTS IN HEADNOTES
39 Am Jur, Nuisances § 123 *et seq.*

*A. Floyd Blakeslee,* for plaintiff.

*Poole, Warren & Littel,* for defendants.

SMITH, J. This case involves a zoning controversy. The defendants own gravel-bearing property in the township of Bloomfield and they wish to develop it commercially. The trouble is that it is in an area zoned for residential purposes. The township, hence, seeks to restrain the operation. The owners, by cross bill, attempt to enjoin the township's interference with their mining operation. The trial court upheld the ordinance, and the defendants (who will hereafter be referred to as the owners) took a general appeal. Thus the bare bones of the controversy. Other facts will be filled in as we go on.

Upon appeal the owners assert that the zoning ordinance is invalid because adopted at a special meeting of the township board, is not based upon a plan formulated as required by the enabling act, and that it is invalid and unconstitutional as applied to the owner's property because it is unreasonable, arbitrary and confiscatory. In addition, they claim a prior, nonconforming use.

The owners had purchased the property now in litigation early in 1951. It is in section 1 of the township, being the southeast 1/4 thereof, bounded on the south by section 12, the southwest by section 11, and on the west by section 2. Since 1913 the appellants have conducted gravel removal operations on their property in section 2. The site in section 1 was purchased in anticipation of the exhaustion of this source. The land in sections 1, 2, 11, 12, and certain others comprising roughly the northeast corner of the township was unzoned until 1952. (The other township property, described as district 1, had been zoned purely residential in 1940.) At a special meeting of the township board on January 30, 1952, the

northeast corner was zoned as district 2, upon the same basic plan as was used for district 1.

At this point we face the first of the owners' objections to the validity of the enactment of the zoning ordinance, namely, that the enactment is not grounded on a basic plan "to promote the public health, safety, morals and general welfare" in accordance with the township rural zoning act.* The statute, it is urged, provides a mandatory requirement for the enactment of zoning ordinances and sets forth the factors to be considered in formulating a basic plan of zoning for a district, no single one of which, *i.e.*, the conservation of property values, will sustain the ordinance, if there is a total disregard of others, *e.g.*, extraction and conservation of natural resources.

With respect to the plan adopted, it was the testimony of a member of the township zoning commission that they "had experienced people go over the territory," and that "the territory and surroundings were taken into account." They had, it was testified, "various experts in, land men who went over the proposition." In addition, the chairman of the commission testified that the basic plan in force under the zoning ordinance for district 1 of the township (which has been in operation for many years) was

---

* PA 1943, No 184, § 3 (CL 1948, § 125.273 [Stat Ann 1949 Rev § 5.2963(3)]). "The provisions of the zoning ordinance shall be based upon a plan designed to promote the public health, safety, morals and general welfare, to encourage the use of lands in accordance with their character and adaptability and to limit the improper use of land, to avoid the overcrowding of population, to provide adequate light and air, to lessen congestion on the public roads and streets, to reduce hazards to life and property, to facilitate adequate provision for a system of transportation, sewage disposal, safe and adequate water supply, education, recreation and other public requirements, and to conserve the expenditure of funds for public improvements and services to conform with the most advantageous uses of the land, resources and properties; and shall be made with reasonable consideration, among other things, to the character of each district, its peculiar suitability for particular uses, the conservation of property values and natural resources, and the general and appropriate trend and character of land, building and population development."

considered as the basis for zoning district 2. This was sufficient in their opinion to become the basic plan for this contested ordinance. The ordinance and map were approved by the Oakland county zoning committee.

We cannot conclude, from the above, and the record as a whole before us, that the zoning ordinance was enacted, as charged, without the formulation of a basic plan as required by the statute. The contrary seems to have been the case. The reasonableness of the plan, of course, and consequently of the ordinance, are different, though related, questions. We are unpersuaded that the lower court was in error in its rejection of the argument thus made.

The next objection raised by the owners with respect to the enactment of the ordinance is that it was adopted at a special meeting of the township board. This is said to be in violation of an asserted statutory mandate that such adoption may be accomplished only at a regular meeting.* The township admits the enactment at a special meeting. It urges, however, that the distinction between regular and special meetings has, in and of itself, no legal significance with respect to the issue before us, pointing to PA 1951, No 46, which provides, in part, as follows:

"Special meetings of the township board shall be held at such times as may be fixed by the board at any meeting or when in the discretion of the supervisor

* As originally enacted the section provides (PA 1943, No 184, § 11): "At the next regular meeting or at any special meeting called for the purpose, after receiving the recommended zoning plan from the township zoning board, the township board shall consider such recommendations and vote upon the adoption of a zoning ordinance for the unincorporated portions of the township."

It was amended by PA 1949, No 310 to read, in part, as follows: "Thereafter at any regular meeting the township board may adopt, in accordance with this act, a zoning ordinance for the unincorporated portions of the township." CLS 1954, § 125.281 (Stat Ann 1955 Cum Supp § 5.2963[11]).

it appears advisable. * * * However, if all of the members of the said board are present at any special meeting thereof, then any business which might lawfully come before a regular meeting of said board may be transacted at such special meeting." CLS 1954, § 41.72a (Stat Ann 1955 Cum Supp § 5.64[1] ).

We are constrained to agree that the legislative intent, here expressed, is that the township board has the authority to do at any special meeting any matter which might be transacted at a regular meeting provided other statutory requirements are fulfilled. We are mindful in this regard that the burden of proof is upon him who attacks the ordinance to show by competent evidence that it was not legally enacted, *Thorne* v. *Squier,* 264 Mich 98 (89 ALR 126), and that an ordinance, like a statute, is presumed valid unless the contrary is shown by competent evidence, *Harrigan & Reid Co.* v. *Burton,* 224 Mich 564 (33 ALR 142). The appellants have established only that the ordinance was enacted at a special meeting and the record discloses nothing more ominous. In view of this we cannot say the presumption of validity is rebutted. The trial court's findings in this respect are worthy of repetition:

"The challenge that the ordinance is invalid because of the failure of a valid statutory enactment is based upon the most exacting of technical objections. A public hearing was held upon the ordinance subsequent to notices for that purpose having been published in the Birmingham Eccentric and the Pontiac Daily Press. The ordinance and maps were submitted to the Oakland county zoning commission and approval received. The ordinance was adopted by the township board and published in the Birmingham Eccentric and it was entered in the book of ordinances. There was a substantial compliance with the statute in the enactment of the ordinance in the opinion of the court to justify holding its validity."

The owners challenge, also, the constitutionality of this zoning ordinance as applied to their property because it is said to be unreasonable, arbitrary, and confiscatory. The charge made requires an exhaustive examination of the area affected, its location, its use, and the activities now, and in the reasonably foreseeable future, to be found thereon, as well as the nature of the use excluded. The exhibits show an area of gently rolling hills, in part heavily wooded. We may take judicial notice of its proximity to great centers of population in its area. In the decade from 1944 to 1954 the township saw an increase ("mostly all residential") from an assessed valuation of $8,069,480 to $21,278,635. It is an area of relatively expensive homes. The township officials do not "expect a density of population growth in this area comparable to an urban development." Immediately south of section 1 is section 12, the adjoining portion of which contains Kentmore subdivision, with homes under construction ranging in value from $28,500 to $40,000. Not contained in the township, but located in the adjoining Troy township, to the east, is the Charnwood Hills subdivision, the northwest corner of which adjoins the property in question. This contains over a hundred lots, of an average size of 1-1/4 acres, with some 80 homes costing upwards from $25,000 either built or nearing completion. The trial court's finding that "Bloomfield township as a whole is acknowledged as an area extremely well situated, lending itself to the best type of suburban development" is amply justified by the record.

' Gravel, also, is found in the area, and it is the occurrence of this natural deposit in a township so well adapted to, and so extensively utilized by, residential development which lies at the root of our problem. In section 11, immediately south of section 2 (which contains the owner's presently operating

pit) is located the township gravel pit. We note, in passing, that in section 1, where the property in question is situated, 3 or 4 houses have been built in the last 10 years, while in section 2, in which the mining operations have taken place, no permits have been issued in the same decade. The operation of the owner in section 2 (unquestioned as a nonconforming use) employs "bulldozers and crushers on the property, 2 stone crushers and a vibrator (screening process)." It does "not have a washer." The primary operation is the "excavation of highway gravel and stock piling it for purchase." In the opinion of several real-estate brokers, gravel operations upon the property in question would depreciate all of the surrounding property up to a half mile, and "would be definitely and decidedly detrimental to the sale and to the use and enjoyment of residential property in the immediate vicinity." The testimony of neighbors in the immediate vicinity of the existing operation varied. Some testified that the operation of the gravel pits was not bothersome to them. Another that it was objectionable (noise, dust, and disturbance of rest) and that, with respect to the proposed operation, "We and others attended a meeting of the zoning board and everyone present voiced objections except Mr. Beardslee." Upon this phase of the case the trial court held that "there was creditable testimony in the case presently before the court to the effect that those lands immediately adjoined to the defendant's, Floyd Beardslee, presently-operated gravel pit suffered a detrimental effect for residential development." We agree.

As we have noted heretofore, it was the anticipated exhaustion of the gravel in section 2 which motivated the purchase of the site in section 1 here in controversy. We are impressed that the owners will suffer a heavy loss in anticipated profits if the ordinance before us is sustained as valid, although

the township counters that the land will still retain considerable value as residential property. Is the ordinance, upon such facts, and others herein enumerated, invalid and unconstitutional because unreasonable, arbitrary, and confiscatory? It is urged to us that the ordinance prohibits the removal of a natural resource. This, the owner insists, is invalid. "There exists," we are told, "a legal right to exploit natural resources where they may be found." If this be the law then the owner has, in truth, been grievously hurt by the action of the township and the lower court. And it is undoubtedly true, as the owner further points out, that the "extraction of natural resources from below the surface must be undertaken at that spot or not at all."

Attractive though the argument may seem upon its first reading, it must be obvious that a logical application of its principle would be destructive of all zoning. For in each case the particular parcel has, it is always asserted, some peculiar utility: it is an ideal spot for a motel, or a factory, or a junk yard, or what not. It has that contiguity to traffic, that peculiar topographical structure, that supply of water or shade, which makes it unique. Yet, just as the surface user desired by the owner must give way, at times, to the public good, so must the subsurface exploitation. In each case the question is whether, on the peculiar facts before us, the ordinance is a reasonable regulation in the interests of the public good, or whether it is an arbitrary and whimsical prohibition of a property owner's enjoyment of all of the benefits of his title. The test in such cases has been well stated by the Massachusetts court in *City of Pittsfield* v. *Oleksak,* 313 Mass 553, 555 (47 NE2d 930):

"Whether the impact of a zoning ordinance upon the particular use which a landowner desires to make

of his land is a reasonable and permissible interference with his rights as owner in the exercise of the police power for the public benefit or is an arbitrary, unreasonable, and oppressive, and therefore forbidden, deprivation of private property without compensation often depends upon the peculiar circumstances of the particular instance. *Village of Euclid* v. *Ambler Realty Co.,* 272 US 365, 387, 395 (47 S Ct 114, 71 L ed 303, 54 ALR 1016). It may be said that in such cases law and fact march together. The correct decision is to be found in the answer to the question whether the particular interference that causes injury to the individual can reasonably be thought to have some tendency to advance the interests of the public, either in the direct consequences, or indirectly by upholding the integrity of a system that as a whole may reasonably be thought to promote the interests of the public."

The validity of similar prohibitions, as applied to particular properties, has been sustained in many jurisdictions, despite the result that the owner thereby lost a valuable natural deposit in the land. See *Town of Burlington* v. *Dunn,* 318 Mass 216 (61 NE2d 243, 168 ALR 1181) cert. den., sub nom., *Dunn* v. *Town of Burlington,* 326 US 739 (66 S Ct 51, 90 L ed 441); followed in *Town of Billerica* v. *Quinn,* 320 Mass 687 (71 NE2d 235); *Town of Seekonk* v. *John J. McHale & Sons, Inc.,* 325 Mass 271 (90 NE2d 325); *Butler* v. *Town of East Bridgewater,* 330 Mass 33 (110 NE2d 922); *Beverly Oil Co.* v. *City of Los Angeles,* 40 Cal2d 552 (254 P2d 865); *West Brothers Brick Co.* v. *City of Alexandria,* 169 Va 271 (192 SE 881), appeal dismissed, 302 US 658 (58 S Ct 369, 82 L ed 508), rehearing denied, 302 US 781 (58 S Ct 480, 82 L ed 603); *Marblehead Land Co.* v. *City of Los Angeles,* 47 F2d 528, cert. den., 284 US 634 (52 S Ct 18, 76 L ed 540); *Struyk* v. *Samuel Braen's Sons,* 17 NJ Super 1 (85 A2d 279). There is nothing in *City of North Muskegon* v. *Miller,* 249 Mich 52,

57, inconsistent herewith. ("Practically all the witnesses agreed that the lowland was useless for residential purposes.")

The factual similarity between the case at bar and the *Burlington Case, supra,* justifies an extensive excerpt from the case (pp 221, 222):

"In our opinion the bylaw is a valid constitutional regulation of the defendants' use of their land. We may take judicial notice of the fact that Burlington is a small town, generally residential in character, located within commuting distance of Boston. There are approximately 50 residences within a radius of half a mile from the premises. The defendants have commenced to remove the soil by scraping it into piles with a 'bulldozer' and taking it away by means of a steam shovel and trucks. The stripping of the top soil from a tract of land is not only likely to produce disagreeable dust and noise during the process, which may be prolonged, but, more important, after it is completed it leaves a desert area in which for a long period of time little or nothing will grow except weeds and brush. It permanently destroys the soil for agricultural use and commonly leaves the land almost valueless for any purpose. The effect of such an unsightly waste in a residential community can hardly be otherwise than permanently to depress values of other lands in the neighborhood and to render them less desirable for homes. If this process should be repeated upon tract after tract of suburban land the cumulative effect might well become disastrous to certain localities. The town must continue to maintain roads and public services past such blighted areas in spite of the fact that taxable values are destroyed and development retarded. All this concerns the public welfare in the constitutional sense. *Wilbur* v. *Newton.* 302 Mass 38, 42, 43 (18 NE2d 365). It is natural that a town of the character and situation of Burlington should endeavor to protect itself against such consequences.

Aesthetic considerations are in themselves entitled to some weight along with other considerations."

On the topic, generally, see 8 McQuillin, Municipal Corporations (3d ed), §§ 25.135, 25.136; 2 Rathkopf, Law of Zoning and Planning (3d ed), p 329 *et seq.;* 2 Yokely, Zoning Law & Practice (2d ed), § 230; Bassett, Zoning, p 215. The above is not to say, of course, that under the particular facts of a given case the legislation may not be found unreasonable. Such, however, does not appear in the circumstances before us.

Finally, the matter of the nonconforming use, or lack thereof. On this point the owners assert that they had a prior nonconforming use of the land which freed their property from the operation of the ordinance.* The property, as has been noted, was purchased in 1951 with the intention of utilizing it for the removal of gravel. According to the owner, he first took gravel from the premises in April, 1951, "by a dragline" but "did no processing of this gravel on the property." Processing was done at the section 2 operation. Additional gravel was removed during 1952 and 1953 by the appellants and the Oakland county road commission.† Several witnesses observed digging upon the property or heard the trucks entering and leaving the property. There were no complaints to the township officials of these activities until May, 1953. Until this date, it is not obvious that operations upon the property were extensive or approached full scale. Something

---

* Section 16 of the township rural zoning act, PA 1943, No 184 (CL 1948, § 125.286 [Stat Ann 1949 Rev § 5.2963(16)]) and section 3 of the zoning ordinance exempt nonconforming uses.

† During 1952 and 1953 the property in question was used, at the township's request, as a township dump. On appellants' own initiative they finally closed the property to use as a dump. As he said, "Because of my experience (fire and scattered refuse) of 2 years with this dump, I decided to quit it."

over 1,000 cubic yards of gravel was removed.\* It was about Memorial Day of 1953 that the appellants moved in heavy equipment and complaints were then made to the township officials, resulting in the present litigation.

To establish a nonconforming use there must be work of a "substantial character" done by way of preparation for an actual use of the premises.† Mere "preliminary" operations, *e.g.*, ordering of plans, surveying the land, removal of old buildings, are not sufficient. *City of Lansing* v. *Dawley,* 247 Mich 394. Nor do occasional operations upon the land suffice to indicate its appropriation to a particular use. See *Mayor and City Council of Baltimore* v. *Shapiro,* 187 Md 623 (51 A2d 273), where the fact that the dismantling, on 2 occasions, of wrecked automobiles upon a lot was held insufficient to appropriate the lots to the nonconforming use of sale of used cars, used parts and the dismantling of wrecks. Also, *People* v. *Hein,* 187 Misc 6 (65 NYS2d 318), where the part-time use of the premises by a school boy for radio, battery, and auto repair could not establish a nonconforming use as a junk yard. We cannot state a comprehensive formula. Each case must stand on its own facts. It is recognized that every zoning regulation involves some impairment of rights. Whether the rights have attained a status so sacred, so inviolate, that they rise above the legislative command, *i.e.*, that the owner has a "vested" right in some particular use, involves a balancing of factors, a determination as to whether the owner's interest is so substantial that its destruction cannot

---

\* It was estimated that there are 7,163,000 cubic yards of gravel in the acreage.

† On this topic, generally, see: 8 McQuillin, Municipal Corporations (3d ed), § 25.186; 2 Rathkopf, Law of Zoning & Planning (3d ed), ch 58, §§ 1–5, pp 1–31; 1 Yokely, Zoning Law & Practice (2d ed), §§ 147–160; Bassett, Zoning, ch 5, pp 105–116. Note, 102 U of Pa L Rev 91 (1953).

reasonably be justified in the light of the accomplishment of the objectives of the ordinance. It is not a matter susceptible to precise quantitative measurement, so many feet excavated, so many trucks ordered, or so many men hired. Thus, in *Town of Billerica* v. *Quinn, supra,* the property owner several days before the enactment of the ordinance placed a power shovel upon the land and stripped the top soil from an area 30 to 35 feet wide and extending part of the length of the land. No nonconforming use of the premises was found by the court. Its reasoning is enlightening (pp 689, 690):

"It does not necessarily follow from what has been said that an existing use for the operation of a stone quarry, for example, or a sand or gravel business, or even for the removal of loam, can never be continued by increasing the area of extraction after the passage of a zoning ordinance or bylaw excluding such use from the neighborhood. It is conceivable that a larger area than that previously excavated may have been devoted to the use by actual occupation of the land in a manner physically appropriating it to the use, as for example by means of structures, use for storage or ways, preparation of the ground, or even perhaps by fencing off the portion to be used, if the fencing had particular relation to the use. * * * In the case before us nothing had been done amounting to an actual appropriation to the use of any of the land except the particular area stripped. The mere intention to strip the remainder of the land did not amount to an existing use of it."

This and the guiding principle expressed by this Court in *City of Lansing* v. *Dawley, supra,* and again by the Ohio court in *Smith* v. *Juillerat,* 161 Ohio St 424, 431 (119 NE2d 611) seem here decisive:

"The rule seems to be that where no substantial nonconforming use has been made of property, even

though such use is contemplated, and money has been expended in preliminary work to that end, a property owner has acquired no vested right to such use and is deprived of none by the operation of a valid zoning ordinance denying the right to proceed with his intended use of the property."

The trial court, characterizing testimony of the owner's prior use as "meager," could not find as a matter of fact sufficient operation to come within the purview of a nonconforming use. We see no compelling reason justifying our overruling its decision.

Upon the record as a whole we are inclined to believe, with the trial court—

"that factually, the operation of a gravel pit as contemplated by the defendants and cross plaintiffs will eventually blight the area. It will add to traffic hazards. It will result in unnecesary regulation and policing of the area. The regulation is not a destruction of the defendants' property values because they can very profitably appropriate it to a use within the terms of the ordinance."

It is our conclusion that the ordinance is valid. The deleterious effect of the mining operation upon the surrounding area is clear and clearly shown. It is not, in our opinion, curable by the proposed curtailed operations which would necessarily involve excavation and traffic over a period of years not ascertainable at this time. We do not believe it can reasonably be contended that the prohibition of gravel mining operations in this residential area is clearly arbitrary and unreasonable, and that it has no substantial relation to public safety, health, or general welfare. *Village of Euclid* v. *Ambler Realty Co.*, 272 US 365 (47 S Ct 114, 71 L ed 303, 54 ALR 1016). We do not substitute our judgment for that of the legislative body of the municipality on matters of governmental policy and every presumption

is in favor of the validity of the ordinance. It is unfortunate that the prohibition before us may cause financial deprivation to the owner but such is often the effect of zoning ordinances. It is a hardship that must be borne in the light of the public good.

Affirmed. Costs to appellee.

EDWARDS and CARR, JJ., concurred with SMITH, J.

BLACK, J. (*concurring*). The plaintiff township, by its bill, seeks injunctive relief on strength of 2 separate yet consistent theories of equity jurisdiction. The first is that the zoning ordinance considered in Mr. Justice SMITH's opinion validly restricts gravel removal operations, on and from the lands of defendants, and that equity should therefore aid in restraint of such operations. The second is that the testimonial record sustains allegation of the township that the mentioned operations constitute "a very real and active public nuisance" equity should abate. I prefer to sustain the chancellor's decree solely on latter ground and refer in support to the evidentiary facts Mr. Justice SMITH has carefully assembled in his opinion.

My caution, in refraining from support of this ordinance as applied to defendants' asserted right of use of their lands, may indeed be due to an excess of concern over the implications of zoning the depths distinguished from zoning the surface. Such concern is, nevertheless, sustained by respected authority we have followed (*Village of Terrace Park* v. *Errett* (CCA 6), 12 F2d 240; *City of North Muskegon* v. *Miller,* 249 Mich 52, 57–59), wherein stress is laid upon the importance of "not destroying or withholding the right to secure oil, gravel, or mineral from one's property, through zoning ordinances, unless

some very serious consequences will follow therefrom."

I concur, then, in affirmance on ground that an averred and enjoinable public nuisance has been testimonially established.

DETHMERS, C.J., and SHARPE, and KELLY, JJ., concurred with BLACK, J.

VOELKER, J., took no part in the decision of this case.