HEATH TOWNSHIP v SALL

Docket No. 92479. Argued January 12, 1993 (Calendar No. 3). Decided
    June 22, 1993.

Heath Township brought an action in the Allegan Circuit Court
    against Gerald W. Sall and Joyce Sall, to enjoin them from
    constructing a mobile home park on the ground that the land
    had reverted to zoning only for single-family residential use
    following a referendum on the township zoning board's grant of
    the defendants' prior request to rezone the land as multiple-
    family residential. The court, George R. Corsiglia, J., issued a
    preliminary injunction enjoining occupancy, but allowing con-
    struction at the defendants' risk. A permanent injunction sub-
    sequently was granted after the defendants failed to establish a
    prior nonconforming use. The Court of Appeals, MURPHY, P.J.,
    and D. E. HOLBROOK, JR., and SAWYER, JJ., reversed in an
    opinion per curiam, finding that sufficient action was taken by
    the defendants to change the character of the land while
    construction of a mobile home park was permitted so as to
    grant vested rights and to create a prior nonconforming use of
    the property as a mobile home park (Docket No. 126375). The
    township appeals.

In an opinion by Justice MALLETT, joined by Chief Justice
CAVANAGH, and Justices LEVIN, BRICKLEY, and BOYLE, the
Supreme Court held:

The defendants failed to prove the requisite tangible change
in the property to establish a prior nonconforming use.

1. Use of particular property that does not conform to zoning
restrictions but that lawfully existed before the effective date of
the restriction may be permitted as a prior nonconforming use.
To establish such use, a property owner must engage in work of
a substantial character in preparation for an actual use of the
premises that materially and objectively changes the land
itself. Once a nonconforming use is established, a subsequently
enacted zoning restriction, although reasonable, will not divest
the property owner of the vested right.

2. A zoning restriction's enactment date is the critical point
in determining when a nonconforming use vests. In this case,
only construction between October 13, 1986, and February 2,
1987, the date of the referendum disapproving multiple-family

residential use, is germane. Because the defendants' activities during this period, in the aggregate, were not substantial, a legally cognizable preëxisting nonconforming use was not established.

3. The defendants also failed to obtain the requisite mobile home permit before the referendum. A building or mobile home permit alone does not confer vested rights, however; actual construction must begin. An evaluation of whether construction is substantial is necessarily subjective and will vary from case to case.

Reversed and remanded.

Justice RILEY, joined by Justice GRIFFIN, concurring in part and dissenting in part, stated that the petition for a referendum pursuant to MCL 125.282; MSA 5.2963(12) and the subsequent reversal of the zoning designation granted to the defendants precluded the establishment of the property expectations and good faith necessary to constitute a nonconforming use. To hold otherwise would eviscerate the statute by permitting developers to circumvent its requirements by quickly engaging in construction sufficient to establish a nonconforming use before a referendum may be held.

The purpose of the nonconforming use doctrine is to protect the property expectations of a prior user and to avoid imposition of hardship on owners of property. When a township rezones a parcel of property, the owner is presumed to understand that a petition might be filed within thirty days that could lead to a referendum reversing the township's decision. In this case, because the defendants understood that the favorable zoning designation that they were granted was subject to revocation, no nonconforming use could be established. They were continuously aware of the possibility of a quick revision in zoning because of the filing of the petition and the impending referendum, and, thus lacked the requisite good faith for a nonconforming use. No nonconforming use could vest until after the thirty-day petition period had expired if no petition was filed, or until after a referendum if a petition was filed.

191 Mich App 716; 478 NW2d 678 (1991) reversed.

*Bauckham, Sparks, Rolfe & Thomsen, P.C.* (by *John K. Lohrstorfer*), for the plaintiff.

*John A. Watts* for the defendants.

MALLETT, J. We granted leave to determine

whether defendants established a prior noncon-
forming use of their property as a mobile home
park before passage of a referendum rejecting
defendants' rezoning proposal. The Court of Ap-
peals answered affirmatively. We hold that defen-
dants failed to prove the requisite tangible change
in the property to establish a prior nonconforming
use.

I

In 1985, defendants Gerald and Joyce Sall pur-
chased approximately 16 acres of land in Heath
Township with the intention of building a mobile
home park on the property.[1] On the purchase date,
the land was zoned R-2 (single-family residential
zone) within which mobile home parks were not
permitted. On October 13, 1986, however, the
township board granted defendants' request to
rezone the property to R-3 (multiple-family resi-
dential). Subsequently, the residents, opposed to
the zoning change, petitioned for a referendum
pursuant to MCL 125.282; MSA 5.2963(12).[2]

---

[1] Defendants contended that the purchase price ($53,500) was
$26,000 more than the land was worth without the anticipated rezon-
ing. They were willing to pay the excessive price because the Heath
Township land use plan showed the property to be within a future
R-3 zone. Note, however, that the purchase of property with an inten-
tion to use it for a particular purpose does not give the owner a right
to so employ the plat in violation of a subsequently enacted zoning
restrictions. *Detroit Edison Co v City of Wixom,* 382 Mich 673, 685;
172 NW2d 382 (1969).

[2] MCL 125.282; MSA 5.2963(12) provides, in pertinent part:

Within 30 days following the passage of the zoning ordinance,
a petition . . . may be filed with the township clerk requesting
the submission of an ordinance or part of an ordinance to the
electors residing in the portion of the township outside the
limits of cities and villages for their approval. Upon the filing
of the petition, an ordinance or part of an ordinance passed by
the township board shall not be invalidated unless it is rejected
by a majority of the registered voters located in the portion of
the township outside the limits of cities and villages voting

On February 2, 1987, local residents voted to return the property to its original single-family residential classification. However, during the time between the board's vote and the referendum, defendants spent approximately $18,000 preparing the site for construction. The work included developing detailed construction plans, procuring several local permits for future excavating and plumbing, purchasing sewer pipe, drilling a water well, constructing a wellhouse, installing four test wells, excavating for roads, removing topsoil, clearing trees, and obtaining a topographical survey.

Before the referendum, defendants filed an application with the state for a mobile home park license. Their initial application was returned with a request for additional information. In April 1987, defendants resubmitted the application after the unfavorable referendum vote. In late July, 1987, the state orally notified defendants and plaintiff that it intended to issue a mobile home park permit to the defendants.[3] At this point, defendants began further construction.[4] On August 17, 1987, the township wrote a letter to defendants insisting that they stop constructing the mobile home park. After defendants refused, the township filed an action for injunctive relief.

The Allegan Circuit Court enjoined defendants from occupancy, but allowed construction "at their own risk." Relying on *Gackler Land Co, Inc v Yankee Springs Twp*, 427 Mich 562; 398 NW2d

thereon at the next regular election which supplies reasonable time for proper notices and printing of ballots, or at any special election called for that purpose.

[3] Plaintiff contends that defendants did not inform the state of the referendum outcome, i.e., they misled the state, or at least remained silent when they should have been forthcoming.

[4] Between February and August of 1987, defendants spent an additional $15,000 to prepare, construct, and equip the realty for use as a mobile home park.

393 (1986), the trial court held that defendants' actions before the referendum were insufficient preliminary operations that did not establish a prior nonconforming use. Accordingly, the court opined that the referendum zoning controlled, and that use of the property as a mobile home park would violate the zoning ordinance. Ultimately, on February 8, 1990, the trial court granted the township a permanent injunction.

The Court of Appeals reversed the trial court's decision, stating:

> In the case at bar, we agree with defendants that they took sufficient action toward changing the character of the land while the zoning permitted construction of a mobile home park on the parcel so as to grant the defendants vested rights and create a prior nonconforming use of the property as a mobile home park before the electorate's decision to return the zoning to R-2. Specifically, while the preparation of the survey and site plans and the clearing of trees and debris would not be sufficient to create a prior nonconforming use, defendants' conduct went beyond mere preparation for a change in use of the property. They installed a commercial water well, drilled four additional test wells, constructed a wellhouse, and excavated for the construction of roads for the mobile home park. We are satisfied that this action constitutes a tangible change in the land by excavation and construction that goes beyond mere preliminary operations to establish the nonconforming use. [191 Mich App 716, 719-720; 478 NW2d 678 (1991).]

Plaintiff Heath Township appeals the Court of Appeals decision granting defendants vested rights sufficient to create a prior nonconforming use of the property as a mobile home park. We reverse.

II

A prior nonconforming use is a vested right in the use of particular property that does not conform to zoning restrictions, but is protected because it lawfully existed before the zoning regulation's effective date. *Dusdal v City of Warren,* 387 Mich 354, 359-360; 196 NW2d 778 (1972). In other words, it is a lawful use that existed before the restriction, and therefore continues after the zoning regulation's enactment. Generally, to establish a prior nonconforming use, a property owner must engage in "work of a 'substantial character' done by way of preparation for an actual use of the premises." *Bloomfield Twp v Beardslee,* 349 Mich 296, 307; 84 NW2d 537 (1957). Once a nonconforming use is established, a subsequently enacted zoning restriction, although reasonable, will not divest the property owner of the vested right. *Dusdal, supra.* Thus, a prior nonconforming use is an exception to zoning's general principle that certain uses should be confined to certain localities.[5]

This Court recently examined the standard for establishing a nonconforming use in *Gackler, supra.* There, the plaintiff platted approximately twenty acres of a 103-acre plat consisting of fifty-four lots. The zoning permitted mobile, prefabricated and site-built homes. After the township approved the plat, restrictions were implemented

___

[5] The common law of prior nonconforming uses has been partially codified. MCL 125.216(1); MSA 5.2961(16)(1) provides in pertinent part:

> The lawful use of a . . . premise as existing and lawful at the time of enactment of a zoning ordinance, or in case of an amendment of an ordinance, then at the time of the amendment, may be continued although that use does not conform with the provisions of the zoning ordinance or amendment.

excluding mobile homes from twelve lakefront lots on the site. Later, the township enacted a zoning ordinance restricting mobile homes to mobile home parks. At this time, eleven single-wide mobile homes occupied the restricted lots. The township amended the ordinance to permit mobile homes meeting the definition of "dwelling" in any zoning classification where site-built or modular single-family residences were permitted. The effect of the ordinance was to exclude single-wide mobile homes from the plaintiff's lots unless they met the definition of dwelling. Among other challenges, the plaintiff contended that he established a prior nonconforming use as a single-wide mobile home plat by constructing a road, surveying the plat, erecting monuments, completing grading and excavation work, and installing eleven mobile homes.

In holding that the plaintiff failed to establish a nonconforming use, we stated that

"there must be work of a 'substantial character' done by way of preparation for an actual use of the premises." *Bloomfield Twp v Beardslee,* 349 Mich 296, 307; 84 NW2d 537 (1957). The actual use which is nonconforming must be apparent and manifested by a tangible change in the land, as opposed to intended or contemplated by the property owner. In this regard, preliminary operations such as ordering plans, surveying the land, and the removal of old buildings are insufficient to establish a nonconforming use. [Citations omitted.] The test in each case is not whether a little or a lot has been spent in reliance upon the past zoning classifications, but, rather, " 'whether there has been any tangible change in the land itself by excavation and construction.' " [*Id.* at 574-575.]

Applying these legal standards to the facts, we held that because the improvements only made the lots equally suitable for single-wide mobile

homes and conventional dwellings, they did not constitute "work of a substantial character which makes apparent an actual use of the plat as a single-wide mobile home plat." *Id.* at 576. Thus, to constitute a legally cognizable nonconforming use, work of a substantial nature beyond mere preparation must materially and objectively change the land itself.

### III

The zoning restriction's enactment date is the critical point in determining when a nonconforming use vests. *Dingeman Advertising, Inc v Algoma Twp,* 393 Mich 89; 223 NW2d 689 (1974).[6] Construction undertaken after the zoning regulation's enactment is inapposite to determining whether a property owner tangibly changed the land. To hold otherwise would encourage noncompliance with the regulation and disparage the import and effect of a referendum.[7] In the instant case, defendants understood as early as October 13, 1986, that a referendum was possible, if not likely. In fact, less than one month later, they knew that petitions were being circulated to initiate a referendum. Nonetheless, defendants decided to proceed with the construction of their proposed mobile home park. On February 2, defendants learned that the referendum passed, returning the property to its original R-2 classification. Accordingly, only construction between October 13, 1986, and February 2, 1987, the date the referendum invali-

. [6] See also *City of Lansing v Dawley,* 247 Mich 394, 396-397; 225 NW 500 (1929).

[7] The propriety and policy of vesting in community residents certain powers of local regulation regarding matters about which they are deeply interested cannot be questioned. Because of their unique knowledge and involvement, citizens may be more competent to judge such matters than any central authority. See *Stadle v Battle Creek Twp,* 346 Mich 64, 70; 77 NW2d 329 (1956).

dated the R-3 zoning, is germane to the current inquiry.

Defendants posit that they established a vested nonconforming use as a mobile home park before February 2, 1987, by (1) obtaining a topographical survey, (2) clearing trees and removing topsoil, (3) installing four test wells, (4) excavating roads, (5) drilling a commercial water well, and (6) building a wellhouse. An independent examination of each activity is necessary.

First, obtaining a topographical survey[8] of the property is a classic example of an insufficient preparatory operation. In fact, in *Gackler, supra,* we expressly denounced "surveying the land" as a preliminary operation. *Id.* at 575. In *City of Lansing v Dawley,* 247 Mich 394, 397; 225 NW 500 (1929), this Court stated that "[defendant] did nothing of a substantial character. He went no farther than to order the plans and cause a survey to be made of the lot. This preliminary work was not sufficient to create a vested right to erect the building." Second, under the facts of this case, clearing trees and removing topsoil are also preliminary ventures. In *Gackler, supra,* we also listed "the removal of old buildings" as an insufficient preparatory activity. *Id.* at 575. Clearing trees and removing topsoil are no more substantial than removing permanent structures such as buildings. As a result, they do not constitute work of a "substantial character."

Third, defendants rely on the installation of four test wells on November 4, 1986. Because the sole purpose of these test wells was to determine the direction of water flow to locate an appropriate place for a sewage system,[9] and nothing more enduring, they are also preliminary in nature.

_____

[8] A topographical survey indicates ground elevations and any adjacent structures on or near the property.

[9] At a show cause hearing, defendant Gerald Sall testified regarding the purpose of the test wells:

Fourth, defendants contend that in furtherance of roadway construction, they removed topsoil and deposited a sand subgrade on November 19-20, 1986. The only helpful testimony regarding roadway construction was that of a defense expert who worked on the site.

> Well, first you've got to strip the topsoil and then you level the sand off for a subgrade and that gravel goes on, then later on you blacktop it.

Because of our admitted unfamiliarity with roadway construction, we would have greatly benefited from further testimony regarding the necessary steps for completion of a residential roadway. Without this assistance, it is difficult to determine whether removing topsoil and putting down a sand

> *Q.* Now, you also testified that in the fall of '86 you had some test wells that were done and you testified that you wanted to find out about the water flow; were there any other reasons that you would do a test well for that area?
> *A.* Not that I can think of.
> *Q.* If you had done a test well and it was shown that the water quality was bad, would that have affected going ahead with the project?
> *A.* These test wells were not to test the water quality, they are to test the way which the water flows so that we could find the location for the sewage system.

A defense expert similarly testified:

> *Q.* Now, we have talked generally about wells and we have heard from Mr. Sall that four test wells were installed, were those installed at your direction?
> *A.* Yes, those were four monitor wells installed to determine —to do kind of a preliminary hydrologic survey to determine the direction of ground water flow on the property; that is used to determine the direction that the water is going to flow away from the sewage disposal system, so that we can keep that system in an area which will not be detrimental to other properties or water supply wells.

subgrade constitute work of a "substantial character." Nevertheless, as the defense expert's testimony implies, we assume, at the very least, that a permanent road requires a grade, such as gravel, and a durable outer shell, like asphalt or concrete. Therefore, because defendants had not yet commenced the more cumbersome and conclusive stages of construction, their road excavation work was insufficiently substantial to constitute a prior nonconforming use.

Fifth, defendants rely on the construction of a five-inch, 184-foot deep commercial water well about October 14, 1986. The purpose of the well was to determine the quantity and quality of the site's water. However, unlike the four test wells, the commercial water well was intended to eventually serve as the mobile home park's permanent water source.[10] Finally, defendants built a concrete block wellhouse in November, 1986. The eight foot high structure was insulated and entirely self-contained. Although testimony did not so indicate, because of the sound construction of the wellhouse, we assume that it was intended for permanent use. Thus, because of the perpetual nature and intended future use of both the commercial water well and the wellhouse, we tentatively conclude that they may constitute work of a "substantial character" that tangibly changed the land.

Michigan case law is clear that there must be construction beyond preliminary preparation to establish a prior nonconforming use. It is the present state of the property, not the present

---

[10] It should be noted that on February 2, 1987, the wellhouse contained no plumbing. Had it contained adequate plumbing, it surely would be sufficiently substantial to be considered in determining whether a nonconforming use was established. Nevertheless, even without the necessary plumbing, we reluctantly conclude that the construction of the wellhouse was substantial enough to be considered.

intention to put property to a future use, that must be the criterion. This examination of defendants' activities indicates that only the commercial water well and wellhouse are individually pertinent. Neither of these activities, in light of the total construction a mobile home park requires, is sufficiently substantial to satisfy defendants' burden.[11] A review of the record evinces that defendants have not borne the burden of proving that work of a "substantial character" toward construction of a mobile home park predated the referendum election.

Additionally, defendants' activities, in the aggregate, are not substantial. In *Gackler, supra,* this Court held that the plaintiff failed to establish a prior nonconforming use despite a fully constructed road, erected monuments, graded and excavated plats, and installation of eleven mobile homes. Comparatively, in the instant case, the defendants removed topsoil and deposited a sand subgrade, but did not complete the construction, and cleared trees and removed soil, but did not fully grade or excavate the property; and, unlike *Gackler,* there were no occupied trailers on the property. Clearly, the construction undertaken in *Gackler* was more substantial than that in the present case. However, this Court in *Gackler* refused to recognize a nonconforming use.[12] Accordingly, on the basis of an individual analysis of defendants' activities and *Gackler,* we find that

[11] Although the amount expended is not determinative, see *Gackler, supra,* defendants spent approximately $18,000 of an estimated $64,000 required before occupancy. The additional $46,000 would have been spent on providing electricity, a sewage system, gas, telephone, and water, among other services.

[12] Admittedly, *Gackler* differs from the present case. Unlike *Gackler,* the instant case concerns the construction of a mobile home plat, not the development of a platted subdivision. Nonetheless, we find *Gackler* instructive.

defendants failed to establish a legally cognizable preëxisting nonconforming use.

IV

Defendants not only failed to commence construction of a "substantial character," they failed to obtain a mobile home permit before the referendum.[13] As previously noted, defendants applied for a mobile home permit in December 1986. Because of the application's deficiencies, it was returned to defendants for additional information. In April 1987, defendants resubmitted the application without informing the state authorities of the referendum. Ultimately, in July 1987, five months after the referendum passed, the mobile home commission granted defendants a verbal building permit. Under Michigan case law,[14] a building permit, or its counterpart, a permit to commence operations, is an important factor in procuring a "vested right."[15] The significance of a permit is embodied in *Dingeman, supra:*

Once a city or township issues a valid permit to an applicant, that applicant has every reason and

[13] MCL 125.1113; MSA 19.855(13) (now renumbered MCL 125.2313; MSA 19.855[113]) provides:

(1) A person shall not construct a mobile home park or seasonal mobile home park without obtaining a permit issued by the department.
(2) Construction may begin upon the granting of a permit to construct by the department.

[14] See *Bevan v Brandon Twp,* 438 Mich 385; 475 NW2d 37 (1991); *Franchise Realty Interstate Corp v Detroit,* 368 Mich 276; 118 NW2d 258 (1962); *De Mull v City of Lowell,* 368 Mich 242; 118 NW2d 232 (1962).

[15] A building permit is only pertinent to obtaining a vested right. We do not intend to imply that a permit is required to conduct initial construction. In fact, the defendants obtained various local permits after the referendum.

right to rely thereon in his business dealings. Permits are not issued by local authorities when the contemplated use for which the permit is issued conflicts with a local zoning ordinance. Should these ordinances change, the average holder of such a permit, even if he had notice of the change of ordinance, would not necessarily presume that the new ordinance applied to him. After all, he has within his possession an official document of the local community authorizing him to proceed with his contemplated project.

While it is true that the issuance of a permit itself will not give vested rights to a nonconforming use to the holder thereof, the possession thereof, and substantial reliance thereon, will give such rights. [*Id.* at 98-99.]

This Court recently further examined building permits vis-à-vis nonconforming uses in *Bevan v Brandon Twp,* 438 Mich 385; 475 NW2d 37 (1991). We stated that "[w]here building permits have been applied for, but have not been issued, vested rights are not acquired, even though significant sums may have been expended by the applicant." *Id.* at 402. Finally, a building or mobile home permit alone does not confer "vested rights." Actual construction must begin. *Dawley, supra.*

v

We cannot state a comprehensive formula for precisely what activities are sufficiently substantial to eclipse the prior nonconforming use threshold. It is not a question susceptible of precise quantitative measurements. An evaluation of whether construction is substantial is "necessarily subjective and varies from case to case."[16] In this case, under the specific facts demonstrated in the record, we hold that defendants did not establish a

---

[16] *Beasley v Potter,* 493 F Supp 1059, 1072 (WD Mich, 1980).

prior nonconforming use before February 2, 1987.
Their construction was not of a "substantial character," nor did they obtain a mobile home permit.[17]

Accordingly, we reverse and remand to the
Court of Appeals for determination of the issues
not previously resolved.

CAVANAGH, C.J., and LEVIN, BRICKLEY, and
BOYLE, JJ., concurred with MALLETT, J.

RILEY, J. (*concurring in part and dissenting in
part*).

I

While I agree with the majority that no nonconforming use was established by defendants' construction, I would also hold that defendants did
not possess a nonconforming use because the citizens of the municipality, by filing a petition and
reversing the zoning designation pursuant to MCL
125.282; MSA 5.2963(12), precluded the establishment of the property expectations and good faith
necessary to constitute a nonconforming use. To
hold otherwise would eviscerate the statute by
permitting developers to circumvent its requirements by quickly engaging in construction sufficient to establish a nonconforming use before a
referendum pursuant to the act may be held.

II

A

In Michigan, the nonconforming use doctrine

---

[17] Today's holding should not be read by developers to encourage a
frantic race toward an arbitrary percentage of completion. Important
factors to be considered are whether the developer obtained a permit,
what and when the developer knew and what further construction
was necessary to complete the project.

permits a citizen to utilize property in contradiction of a zoning ordinance if the property was utilized for that purpose before the enactment of the ordinance. *Dusdal v City of Warren,* 387 Mich 354, 359-360; 196 NW2d 778 (1972). The citizens of Heath Township, through referendum, certainly possessed the right to reject the zoning ordinance in question, "but this right was subject to vested property interests . . . ." *City of Lansing v Dawley,* 247 Mich 394, 396; 225 NW 500 (1929).[1] This must be so because the revocation of a zoning " 'ordinance requiring immediate cessation of a nonconforming use may be held to be unconstitutional because it brings about a deprivation of property rights out of proportion to the public benefit obtained . . . .' " *Gackler Land Co, Inc v Yankee Springs Twp,* 427 Mich 562, 574; 398 NW2d 393 (1986), quoting *Austin v Older,* 283 Mich 667, 676; 278 NW 727 (1938).[2]

However, because the existence of nonconforming uses undermines the goals of zoning legislation —i.e., the uniform utilization of land to promote economic development, maintenance of property values, and high standards of living[3]—the right is

[1] See also *Dusdal, supra* at 359-360.

[2] See also 8A McQuillin, Municipal Corporations (rev 3d ed, 1992 Cum Supp), § 25.180, p 2 (citations omitted).

[3]  Uses of land which do not conform to the comprehensive zoning ordinances of the community have been a source of concern to legislators and planners since the first such ordinance was enacted by the city of New York. These nonconforming uses limit the effectiveness of land-use controls and share responsibility for the blight which has infected some urban areas. Municipal attorneys, urban planners, and law review commentators agree that nonconforming uses imperil the success of the community plan and injure property values. [1 Anderson, American Law of Zoning, 3d, § 6.02, p 450. Citations omitted.]

strictly construed.[4] In fact, this Court has recognized that the aim of public policy is the gradual elimination of nonconforming uses. *South Central Improvement Ass'n v St Clair Shores*, 348 Mich 153, 158; 82 NW2d 453 (1957).[5]

Michigan has codified the doctrine of nonconforming uses in MCL 125.216(1); MSA 5.2961(16)(1), which mandates:

> The lawful use of a building or structure and of land or a premise [sic] as existing and lawful at the time of enactment of a zoning ordinance, or in the case of an amendment of an ordinance, then at the time of the amendment, may be continued although that use does not conform with the provisions of the zoning ordinance or amendment.[6]

Not only are the zoning decisions of municipalities modified by the doctrine of nonconforming uses, MCL 125.282; MSA 5.2963(12) mandates a popular check upon those decisions:

> Within 30 days following the passage of the zoning ordinance, a petition signed by a number of qualified and registered voters residing in the portion of the township outside the limits of cities and villages equal to not less than 8% of the total vote cast for all candidates for governor, at the last preceding general election at which a gover-

---

[4] The Supreme Court of Maine enunciated a widely shared view when it said: ["]Nonconforming uses are a thorn in the side of proper zoning and should not be perpetuated any longer than necessary. The policy of zoning is to abolish nonconforming uses as speedily as justice will permit." [Anderson, n 3 *supra*, § 6.07, pp 465-466, quoting *Windham v Sprague*, 219 A2d 548, 552-553 (Me, 1966).]

[5] The consensus of jurisdictions concur. See 8A McQuillin, n 2 *supra*, § 25.183, p 22; Anderson, n 3 *supra*, § 6.07, pp 464-465.

[6] See also MCL 125.583a; MSA 5.2933(1).

nor was elected, in the township may be filed with the township clerk requesting the submission of an ordinance or part of an ordinance to the electors residing in the portion of the township outside the limits of cities and villages for their approval. Upon the filing of the petition, an ordinance or part of an ordinance passed by the township board shall not be invalidated until it is rejected by a majority of the registered voters . . . .

Through the mechanism of the popular referendum, the Legislature has placed the resolution of zoning decisions in unincorporated municipal areas directly to the will of the people.[7] The referendum, therefore, is " 'entitled to respect and should not be abridged by withdrawal from [its] processes of matter with which [it is] intended to deal.' " *Stadle v Battle Creek Twp,* 346 Mich 64, 69; 77 NW2d 329 (1956), quoting 5 McQuillin, Municipal Corporations (rev 3d ed), § 16.48, p 241.

B

At issue in the instant case is the ancient contention between the protection of individuals' property rights and society's power to regulate property. More concisely, this case presents the interaction between individuals' property rights as protected by the nonconforming use doctrine and the citizenry's right to reverse unpopular zoning decisions. Although evoking monumental questions involving the fundamental basis of our govern-

[7] *Stadle v Battle Creek Twp,* 346 Mich 64, 69; 77 NW2d 329 (1956), quoting 5 McQuillin, Municipal Corporations (rev 3d ed), § 16.48, p 241 (" '[t]he initiative and referendum are recognized as instruments of democratic government, widely used and of great value' "); *Lanphear v Antwerp Twp,* 50 Mich App 641, 645; 214 NW2d 66 (1973) (the statute "provides the inhabitants of unincorporated areas the final say whether to accept or reject a proposed zoning ordinance for unincorporated township lands").

ment,[8] the specific inquiry is very narrow: was a
nonconforming use created either within the
thirty-day petition period of MCL 125.282; MSA
5.2963(12), or after the filing of a petition and
before the referendum?

The purpose of the nonconforming use doctrine
is to protect the property expectations of the prior
user and to avoid imposition of hardship upon the
owners of property. *Penning v Owens,* 340 Mich
355, 365; 65 NW2d 831 (1954). Hence, MCL
125.282; MSA 5.2963(12) should preclude such ex-
pectations because when a township rezones a
parcel of property the owner is presumed to under-
stand that a petition might be filed within thirty
days that could lead to a referendum reversing the
township's decision. Even apart from this pre-
sumption, in the instant case the majority recog-
nizes that "defendants understood as early as
October 13, 1986, that a referendum was possible,
if not likely. In fact, less than one month later,
they knew that petitions were being circulated to
initiate a referendum." *Ante* at 441. Hence, defen-
dants understood that the favorable zoning desig-

---

[8] Although a case of first impression, the basic issue faced by this
Court is simply another version of the historical struggle between
individual liberty and democratic rule in America. Indeed, this di-
lemma was expressly recognized at the time of our Founding Fathers.
The protection of individual property rights was one of the major
forces undergirding the adoption of the federal constitution. Hamil-
ton, *The Federalist Papers,* No 1, Kramnick, ed (England: Penguin
Books, 1987 [originally published in 1788]) at 90 (noting that the
constitution was motivated, in part, to protect the rights of property).
Yet, the establishment of a republican form of government, guided by
the will of the majority, was also paramount in the drafting of our
fundamental law. Madison, *The Federalist Papers,* Nos 39-40, *supra*
at 254-265 (noting that the constitution was founded on republican
principles). James Madison recognized the fundamental issue: "To
secure the public good and private rights against the danger
of . . . faction, and at the same time to preserve the spirit and the
form of popular government, is then the great object to which our
inquiries are directed." *Id.,* No 10 at 125. Fortunately, the struggle in
the instant case is resolved by the inherent limitations of the non-
conforming use doctrine.

nation was subject to revocation, and any expectation that defendants possessed of maintaining the desired zoning was merely wishful thinking. No nonconforming use, therefore, could be established because defendants were continuously aware of the possibility of a quick revision in zoning because of the filing of the petition and the impending referendum. Cf. *Harding v Bd of Zoning Appeals,* 159 W Va 73, 87; 219 SE2d 324 (1975); *State ex rel Re-Lu, Inc v City of Kenner,* 284 So 2d 866, 868 (La App, 1973).[9]

---

[9] In *Harding, supra* at 87, the court held that developers were not deprived of a vested right by the revocation of a building permit following an appeal, even though they had begun construction in reliance on the issued permit:

> The appellants knew or should have known that anyone aggrieved by a decision by the Board of Zoning Appeals could appeal by writ of *certiorari* to the Circuit Court. The appellants were well aware of the appeal taken and yet chose to go forward with the construction to convert their two-apartment building into four apartments. . . . Appellants proceeded at their own peril in incurring expenditures in reliance on the challenged permit.

In the instant case, of course, defendants did not act during an administrative appeal; however, they did act while on notice that MCL 125.282; MSA 5.2963(12) could quickly be utilized to reverse the township's zoning designation. In essence, the statute permits the citizens of a township to appeal their officials' zoning decisions; hence, the reasoning of *Harding* is dispositive.

Likewise, in *Kenner* the court rejected a developer's attempt to apply equitable estoppel to prohibit a municipality from enforcing a newly enacted zoning ordinance. The developer claimed that he had relied upon an official's assurance, before the ordinance was enacted, that it would not affect his zoning designation. The court found his reliance unjustified:

> [H]e was aware that a new ordinance had been proposed and was under consideration . . . . He knew, or certainly reasonably should have known, that the new ordinance might or might not be adopted as proposed and that it was quite possible it would be adopted after changes which could include deletion of the provision [preserving the favored zoning designation]. [*Id.* at 868.]

Similarly, defendants knew or should have known that a referen-

Similarly, defendants did not possess a nonconforming use because they lacked the good faith necessary for such a finding. "It is only to avoid injustice that zoning ordinances generally except existing nonconforming uses." 8A McQuillin, Municipal Corporations (rev 3d ed), § 25.183, p 22 (citations omitted). Hence, "[r]eliance upon official conduct will not establish a right to nonconforming use unless the landowner relies [upon that conduct] in good faith." 1 Anderson, American Law of Zoning, 3d, § 6.13, p 478 (citations omitted). A finding of good faith, however, is seriously undermined if a landowner is on notice "of a proposed change in the zoning ordinance . . . ." *Id.* at 480. Indeed, "[t]he requisite good faith is lacking if a landowner proceeds with improvements which will be proscribed by the adoption of an ordinance which he knows or should know is pending." *Id.* (citations omitted). In fact, if developers begin or continue construction after they have notice that zoning changes have been proposed, they merely undertake a " 'calculated risk' in proceeding with their construction and [are] not relying in good faith on the absence or non-adoption of the ordinance." *Biggs v Town of Sandwich,* 124 NH 421, 427; 470 A2d 928 (1984).[10] In the instant case,

dum was possible that could have led to a reversion of the zoning designation to its prior status; therefore, any expectation of maintaining the preferred zoning designation was unjustified.

[10] Moreover, generally "a zoning ordinance remains suspended after a petition for a referendum is duly filed until decision by the electorate on the issue." 8A McQuillin, *supra,* § 25.246, p 249 (citations omitted). See also *Jackson v Denver Producing & Refining Co,* 96 F2d 457, 460 (CA 10, 1938); 101A CJS, Zoning and Land Planning, § 92, p 347, citing, inter alia, *W B Gibson Co v Warren Metropolitan Housing Authority,* 65 Ohio App 84; 29 NE2d 236 (1940); 1 Anderson, *supra,* § 4.25, p 282. Accordingly, if the referendum suspended the new zoning ordinance, not only was any construction by defendants after the filing of the petition invalid, any expectation of utilizing the favorable zoning was inappropriate. MCL 125.282; MSA 5.2963(12), however, mandates that an ordinance "shall not be invalidated until

defendants were well aware that their newly won
zoning designation was at risk of quick revocation.
Hence, defendants lacked the prerequisite good
faith, and no nonconforming use may be recog-
nized. *Biggs, supra* at 426-427; *Kenner, supra* at
868.[11]

Furthermore, the majority eviscerates the stat-
ute by encouraging developers to engage in quick
construction before a referendum can occur. The
majority concludes that "construction between
October 13, 1986, and February 2, 1987, the date
the referendum invalidated the R-3 zoning, is ger-
mane to the current inquiry." *Ante* at 441-442.
This analysis clearly circumvents the statute by
potentially finding that a prior nonconforming use
was created during the period either before the
expiration of the thirty-day petition filing period
or after the filing of petition but before the holding
of a referendum. The statute, therefore, becomes
moot if a developer is clever enough to quickly
undertake sufficient construction to meet the gen-
eral nonconforming use doctrine. Contrary to its
assertion, the majority opinion will almost cer-
tainly "encourage a frantic race toward an arbi-
trary percentage of completion" by developers to
the denigration of the democratic process. *Ante* at
448, n 17. Indeed, if in the instant case defendants
had simply completed more construction in a

it is rejected by a majority of the registered voters . . . ." Whether
this clause nullifies the general rule is open to question, but need not
be resolved for the proper disposition of the instant controversy.

[11] Nor does this analysis violate the due process rights of defen-
dants. "[W]here the classification of a zoning measure is held to be a
legislative act, it may be subject to enactment by initiative or ap-
proval by referendum and such action does not violate the property
owner's due process rights." 8A McQuillin, *supra,* § 25.246, pp 248-
249, citing, inter alia, *Eastlake v Forest City Enterprises, Inc,* 426 US
668; 96 S Ct 2358; 49 L Ed 2d 132 (1976). "In such a case, the property
owner still retains the right to seek administrative review and to seek
judicial relief to declare the ordinance invalid." *Id.* at 249 (citations
omitted).

shorter time, the majority would have found a
nonconforming use; such a result circumvents the
intent of the Legislature. Hence, I disagree with
the majority's conclusion that "[t]he zoning restric-
tion's enactment date is the critical point in deter-
mining when a nonconforming use vests,"[12] *ante* at
441, and would hold instead that no nonconform-
ing use could vest until after the thirty-day peti-
tion period had expired (if no petition was filed) or
after a referendum (if a petition was filed).[13]

Such a holding could have the unfortunate effect
of delaying development or improvements upon
newly zoned properties. Developers often would
wait thirty days before beginning construction,
and those awaiting a referendum would be re-
quired to postpone construction even further.[14] The

[12] The authorities cited for this proposition, *Dingeman Advertising,
Inc v Algoma Twp,* 393 Mich 89; 223 NW2d 689 (1974), and *Dawley,
supra* at 396-397, do not involve the application of MCL 125.282; MSA
5.2963(12).

[13] By its very nature this analysis is very narrow and applies only
to the specific interplay between MCL 125.282; MSA 5.2963(12) and
MCL 125.216(1); MSA 5.2961(16)(1). Unlike nearly every other non-
conforming use situation, defendants in the instant case at no time
possessed reasonable expectations that the preferred zoning ordinance
was not subject to change in the immediate future. If defendants
utilized land in accordance with a then-existing zoning designation,
which was not subject to MCL 125.282; MSA 5.2963(12), and the
zoning designation was subsequently altered, then any prior non-
conforming use would most likely be vested because defendants would
have possessed a reasonable expectation that the use would continue.
For example, an industrial manufacturer operating a plant in con-
formity with the then-existing zoning designation that was not subject
to MCL 125.282; MSA 5.2963(12) would have a vested nonconforming
use if the city then altered the zoning designation to residential. On
the other hand, if a developer began to construct a subdivision on the
property, and voters filed a petition pursuant to MCL 125.282; MSA
5.2963(12), and subsequently rejected the rezoning, the developer
would not have established a prior nonconforming use because the
property expectations and good faith necessary for the valid applica-
tion of the doctrine would be nonextant.

[14] Assuming MCL 125.282; MSA 5.2963(12) does not suspend a new
zoning designation, developers could proceed with improvements or
construction pursuant to the new designation, but such work would
be at their risk.

wisdom of this policy, of course, is not for this
honorable Court to debate, but for the Legislature.

GRIFFIN, J., concurred with RILEY, J.