*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STANLEY SIMMONS and PATRICIA SIMMONS,

        Plaintiffs-Appellants,

v

ROGER A. RYDER and PAM BENTLEY,

        Defendants-Appellees.

UNPUBLISHED
February 15, 2024

No. 364826
Gratiot Circuit Court
LC No. 21-000433-CH

Before: LETICA, P.J., and CAVANAGH and SWARTZLE, JJ.

PER CURIAM.

Plaintiffs prevailed in a bench trial on their claims to quiet title and for civil trespass regarding a 31-foot-wide strip of their real property that defendant Roger A. Ryder wrongfully claimed he had acquired when he purchased an adjoining property from defendant Pam Bentley. Following an evidentiary hearing on damages—damages which allegedly resulted from Ryder's removal of some trees, shrubs, and plants, as well as from altering the soil, foliage, and undergrowth—the trial court awarded plaintiff monetary damages in the amount of $1,995, which was the cost of installing 21 arrowwood viburnum trees. The trial court also ordered that (1) a remedial survey be completed—with plaintiffs splitting the $4,350 cost with Ryder; (2) Ryder could reenter the property and complete the remedial excavation work; (3) plaintiffs were not entitled to damages for the installation of a fence; and (4) plaintiffs were not entitled to recover their costs and attorney fees incurred in prosecuting this legal action.

Plaintiffs appeal as of right, challenging the amount of damages awarded, and the holdings that Ryder could perform the remedial excavation work and that the parties were to split the cost of a remedial survey to reestablish the boundary between their properties. We affirm.

## I. BACKGROUND

On February 24, 2021, plaintiffs filed their complaint against defendants Ryder and Bentley to quiet title and for civil trespass, averring that (1) plaintiffs owned real property commonly known as 312 W. Polk Road, Ithaca, Michigan since 1987; (2) Ryder owned real property commonly known as 216 W. Polk Road, Ithaca, Michigan; and (3) Bentley owned real property commonly known as 2025 N. State Road, Ithaca, Michigan. Ryder's property was a

-1-

triangular piece of property in the middle of, and bordering, both plaintiffs' property and Bentley's property. The dispute involved the location of the boundary line between the parties' properties—a boundary line, plaintiffs averred, which was clearly marked and delineated with a fence. More specifically, in 2020 Ryder commissioned a survey of Bentley's property to be performed by Tingley & Associates P.C., for the purpose of splitting Bentley's parcel into two parts—one parcel of which Ryder proposed to purchase. According to plaintiffs' complaint, the Tingley survey depicted the boundary line between plaintiffs' property and Bentley's property so that it inaccurately and erroneously encroached 31 feet onto plaintiffs' property. And Ryder purchased that parcel from Bentley in December 2020. Ryder then proceeded to remove the boundary-line-fence, as well as trees, shrubs, plants, foliage, vegetation, and undergrowth. Ryder also excavated and moved a substantial amount of soil so as to change the topography and elevation of the land.

Count I of plaintiffs' complaint sought to quiet title to the 31-foot strip of real property that was wrongfully appropriated. Alternate claims of adverse possession and acquiescence were stated in Counts II and III, but were subsequently waived by plaintiffs. And Count IV was a claim of civil trespass against Ryder only, seeking damages for the diminution in value of plaintiffs' property, the cost of remediation and restoration of their property, the loss of the value of the trees destroyed, and other damages, as well as treble damages under MCL 600.2919, plus attorney fees, costs, and interest. Plaintiffs attached numerous documents to their complaint, including pictures, maps, property descriptions, deeds, and the Tingley survey.

A two-day bench trial was conducted beginning on April 12, 2022. Plaintiffs' first witness was Gilbert Barish, a professional surveyor for 22 years who testified as an expert in surveying and land descriptions. Barish concluded that the Tingley survey incorrectly established the far westerly boundary line. That survey failed to identify the fence that was located in the disputed area of property which depicts a line of occupation, and also overran a controlling line depicted on previous surveys and adjoining deeds. Barish particularly referred to a 1902 deed which conveyed the west half of the southwest quarter of the southeast quarter and noted that the deed established the controlling line.

Plaintiff Stanley Simmons testified that he owned the property at issue since 1987, and he knew where the boundary lines of the property were located. Remnants of fence lines existed at his west and east boundary lines, and the triangular property next to him, which was defendant Ryder's property, was fenced in its entirety. A survey that had been done in 1990 showed that the boundary was 1288.5 feet west of the southeast quarter of section 24, which is the boundary line between his parcel and Ryder's triangular parcel; they had a common boundary line. The Tingley survey claimed the boundary line to be 1319.54 feet west of the southeast corner. But there had been no dispute about that boundary line until the Tingley survey came up—which provided for a 31-foot gap west of the Ryder triangle. The boundary line at issue had years of scrub growth, pine trees, and other foliage which clearly depicted the line of occupation or possession.

Around January 2022, Stanley testified, he heard Ryder "plowing down my land." Ryder was removing the trees, shrubs, and foliage at that boundary line area, but about 31 feet west of Ryder's triangular parcel. Ryder was also flattening out the land, which left pretty steep cliffs on plaintiffs' property. Ryder's excavation cut into the slope of a hill on plaintiffs' property—leaving a 7-foot ledge—and thereby removed the lateral support for the higher land and trees located there, causing trees to fall. Stanley went to confront Ryder but, by the time he got there, Ryder "had

basically annihilated that 30 foot" of land. Plaintiffs have a single-family home on their property. Ryder has a farming operation on his property, and is involved in cattle farming. The 31-foot strip of land at issue had mature trees on it that "created a complete buffer zone between my land and Ryder property." The growth on that strip of land provided a visual, wind, and noise buffer zone between his residential property and this commercial operation. Now plaintiffs could see everything going on at Ryder's property. Prior to that, he could only see the peak of Ryder's pole barn. Stanley testified that he got a quote from Miller Brothers to excavate, fill, and grade about 700 feet of his property and he also got a quote from Snyder Landscaping for the planting of trees and ground cover for erosion control. These quotes were to restore his property and they amounted to over $100,000.

Plaintiff Patricia Simmons also testified that Ryder's clearing of the east side of plaintiffs' property eliminated the visual, wind, and noise barrier or screen that they had always enjoyed. Patricia testified that Ryder had a lot of industrial or commercial activity on his property related to his farming operation. She was devastated when defendant ruined their property. They had enjoyed walking through the woods and the aesthetics of their natural property for almost 35 years.

The second day of the bench trial commenced on May 26, 2022, and began with the court conducting a site visit. Defendants then called their first witness, Douglas Merchant, the assessor and supervisor of Arcadia Township. Douglas testified that the township required that a survey be performed when Ryder was going to purchase some of defendant Bentley's property and he did not review the survey for accuracy but had no reason to believe the survey performed was inaccurate. He was aware the west-side boundary line was moved on the Tingley survey and created a 31-foot strip gap-parcel between plaintiffs' property and Ryder's triangular property that had never existed. Douglas testified that the value of agricultural property in 2022 was about $5,450 an acre and the value of a residential wooded lot was about $3,500 to $3,800 an acre.

William Tingley, the surveyor who completed the Tingley survey also testified. He had been employed as a surveyor since 1970. Tingley admitted that he was unaware of a 1902 survey which would have affected the drafting of his survey. Tingley also admitted that he saw fragments of a fence on the disputed western border but did not note that on his survey, although usually such monuments are noted. He admitted that his survey was wrong in that it depicted the western boundary line incorrectly—it should have been shown to be 31-feet westerly of where he depicted it so that plaintiffs continued to own that property and not defendants.

Defendant Ryder testified that the Tingley survey did not depict the western boundary of the property line where he thought it was; instead, it was placed 31-feet more westerly and onto plaintiffs' property. Ryder had been on that property his whole life and he and his family always believed the disputed property was plaintiffs' property. He knew there was an old fence which he understood was the boundary line. After he completed purchasing Bentley's property in December 2020, he started making it usable for his farming and cattle operation. He used a brush hog on a skid steer to clear the thick underbrush on the property and hired an excavator to fill in low areas. He also removed some trees. He installed two catch basins with underground tiles just west of his original triangular piece of land. When plaintiff Stanley came over to complain about the clearing of the property, Ryder gave him a copy of the Tingley survey. He knew plaintiffs were upset that he was clearing that land. Ryder also had his attorney send plaintiffs a cease and desist letter, advising them not to contact him or come on his property.

On June 10, 2022, the trial court issued its oral opinion on this matter. The trial court concluded that title to the disputed 31-foot strip of land should be quieted in plaintiffs' favor. Further, plaintiffs established their claim of civil trespass against defendant Ryder under MCL 600.2919(1). However, because Ryder believed he was improving his own property, and such belief was reasonable and credible, plaintiffs were not entitled to treble damages. The court scheduled a future hearing to determine damages.

On September 12, 2022, the trial court entered an order (1) quieting title to the disputed property in favor of plaintiffs and against any right or interest claimed by defendants; (2) finding defendant Ryder liable for civil trespass but not for treble damages; and (3) stating that an evidentiary hearing would be conducted to determine damages.

Thereafter, plaintiffs filed a memorandum of law for the evidentiary hearing on damages for civil trespass. Plaintiffs explained that the real property at issue measured about 31 feet by 1,320 feet, i.e., approximately 40,920 square feet or .93 acres. And that defendant Ryder caused substantial damage to that property "as he essentially completely leveled and cleared an approximately one-acre strip of land that historically [had] been a wooded boundary that provided effective visual, wind, odor, and noise screen between Plaintiffs' residence and the farming operation on Ryder's property." In brief, plaintiffs stated that their request for damages included: (1) the cost of a survey and expert testimony by Gilbert Barish of $6,444 to reestablish the boundary line; (2) the cost for excavation work to partially remediate the damage at a range of $66,414 to $81,550; (3) the cost for landscaping work to partially remediate the damage at a range of $30,151 to $58,005; (4) the cost of a fence at $7,546; and (5) court courts, recording fees, and attorney fees associated with the matter at $35,000. The amount of damages totaled in the range of $151,355 to $200,145. In support of their claim of damages, plaintiffs relied on the cases of *Schankin v Buskirk*, 354 Mich 490, 494-495; 93 NW2d 293 (1958) (damages may include the value of the trees cut to the contemplated or existing use of the land, including the costs of replacement or restoration when the property destroyed had a unique value of its own); *Szymanski v Brown*, 221 Mich App 423, 429-431; 562 NW2d 212 (1997) (replacement costs of trees allowed when the plaintiff had used the property to derive aesthetic and spiritual satisfaction); and *Thiele v Detroit Edison Co*, 184 Mich App 542, 545; 458 NW2d 655 (1990) ("The loss of aesthetic value, the actual monetary value of the trees lost and the cost of their replacement constitute evidence of the diminution in value of the freehold estate."). Plaintiffs also attached photographs and quoted estimates to support their request of damages.

Defendant Ryder filed a response to plaintiffs' memorandum of law, arguing that he obtained a topographic survey[1] through D & M Site, Inc. and had a remediation quote prepared by Merchant Excavating, Inc. which estimated the cost of remediation to be about $30,750. Ryder argued that the quotes plaintiffs received and damages requested were grossly inflated. Ryder argued that the soil that was displaced from plaintiffs' property remains on the property so no fill dirt or topsoil was required. Further, Ryder had the equipment and ability to move that dirt back into its original location in compliance with the D & M Site recommendation. Moreover, Ryder

---

[1] "A topographical survey indicates ground elevations and any adjacent structures on or near the property." *Heath Twp v Sall*, 442 Mich 434, 442, n 8; 502 NW2d 627 (1993).

had the ability to remove the logs, firewood, and other debris upon being granted permission to do so. Defendant Ryder argued that plaintiffs were pursuing grossly excessive damages "vindictively and self-servingly." And plaintiffs were actually seeking to improve their landscape—not simply remediate it—by adding additional trees and a fence that did not previously exist. Further, Ryder argued, plaintiffs were not entitled to court costs and attorney fees because Ryder reasonably relied on the Tingley survey and plaintiffs failed to get their own survey before resorting to filing this lawsuit.

On September 27, 2022, the hearing on plaintiffs' damages commenced. Plaintiffs' first witness was Bruce Waldron, an expert in the field of excavation and owner of Bruce Waldron Excavating. Plaintiffs had requested an estimate on putting their property back the way it was, i.e., for restoration. He determined the amount of material that had been removed from the property and the amount of material it would take to get that property back to a natural state where vegetation would grow. His estimate is dated August 3, 2022. In his estimate, Waldron included a culvert and would raise the grade in an area where plaintiffs used to access their property, but had become washed out with the Ryder changes. He would also dig up the catch basin and tiles that were placed by Ryder and cap them. Ryder had also placed crushed concrete on the property for a parking area which would be removed and replaced with a heavy subsoil and then topsoil. Waldron saw piles of rocks and logs on plaintiffs' property and he would remove the logs and firewood and place them on Ryder's property. While there was a pile of topsoil remaining on plaintiffs' property, it was only about 150 to 200 yards of topsoil and much more had been removed. He proposed to bring in about 850 yards of subsoil and 1400 yards of topsoil. When he walked the property, Waldron noted several places where two to four feet of soil was removed. He determined the amount of material that was needed to make the natural lay of the land; in other words, to build the grade back up to match the contour of the hills and slopes. About 12 inches of topsoil was needed throughout so that trees and vegetation could take root. The total estimated cost of the project was $66,550, which included about $14,600 for labor and equipment. Topsoil costs $28.40 a cubic yard and subsoil costs $12.40 a cubic yard so the cost of materials was more than $50,000. And if he could not access plaintiffs' property through Ryder's property, it would cost an additional $15,000 to build an access road and then remove that access road after the project was completed. Waldron acknowledged a previous estimate by Miller Brothers Excavating from April 2022 which estimated the cost of the project at $66,414—very close to his estimate. And Waldron admitted that he had never been on plaintiffs' property before the purported damage was done.

Plaintiffs' next witness was an expert in landscaping, Mark Hahn, who works at Twin City Landscaping and had worked there for 40 years. He prepared an estimate that was dated August 2, 2022, to restore plaintiffs' property the best they could but it would take time for the growth to occur. The southern 700-feet of land would be larger trees and larger cover items and the northern 620 feet of land would be more ground cover, brush, and shrubs. The total for the most-minimum quote was $30,151, but when larger trees are added the maximum quote was $42,961. Hahn testified that this would be the "bare minimum" to provide for a screen or cover between plaintiffs' property and Ryder's farming operation. Hahn admitted that he had not visited the property before the damage was done, and was relying on plaintiffs' representations as to what the property had been like before the damage.

-5-

On December 2, 2022, the damages hearing continued with plaintiff Stanley Simmons testifying that he wanted to have his property resurveyed to get an accurate drawing and description, and he wanted to reestablish his fence line and wooded area, which would require excavation and landscaping. Stanley received a quote from Gilbert Barish, the surveyor who testified at the bench trial, as to the cost of reestablishing his boundary line and the quote was for $4,350. Stanley testified that he had already paid Barish $2,094.24 to date for his surveying work. Thus, the total cost to reestablish his boundary line was $6,444. Stanley also obtained a quote from Bruce Waldron Excavating for remediation excavation work totaling $66,550. He had previously obtained a quote from Miller Brothers Excavating for remediation work which totaled $66,414. Stanley also obtained a quote from Twin City Landscape for remediation work totaling between $30,151 and $42,961. He had previously obtained a quote from Snyder's Landscape and Design for remediation work totaling $58,005. Before his property was damaged by Ryder, Stanley testified, he enjoyed a visual, wind, odor, and noise screen between his residential property and Ryder's farming operation. And Stanley's goal was to provide that cover or screen that was previously enjoyed between their properties. He and his wife found the wooded portion that was destroyed to be aesthetically pleasing and that privacy was basically why they had purchased that property. The fence posts and fence wire that were on his property were also removed by Ryder. Stanley obtained a quote from Mount Pleasant Fence Sash and Door for the purpose of reestablishing the fence line between his property and Ryder's property and it totaled $7,546.74. Stanley also testified that he had incurred court costs and attorney fees to that date in the amount of $35,000, which he was seeking to be reimbursed by Ryder. On cross-examination, Stanley was apprised of a quote for remediation of plaintiffs' property that Ryder obtained from Merchant Excavating which totaled $30,750. Stanley testified that he had worked with David Merchant in the past; he was a competent excavator and did a good job. Stanley would not have a problem with David doing the remediation work.

Defendant then called David Merchant, who was qualified as an expert witness, and he owns Merchant Excavating. Ryder obtained an engineered print related to the remediation of plaintiffs' property, which were drawings and plans that offered a detailed guide to move the dirt and put the property back to previous grades and slopes. David's quote was based on that engineered print, to "build it to the print," and totaled $30,750. David had worked with Ryder in a professional capacity and thought that Ryder was capable of doing this project himself. David was willing to supervise such a project and would be willing to provide an affidavit to the court in that regard for an estimated cost of $500.

David further testified that he had told Stanley to get an engineered print, i.e., topographic survey, and that he would not provide plaintiffs an estimate without a print. David agreed that the only pile of dirt remaining on plaintiffs' property was about 200 cubic yards. And he agreed that subsoil and topsoil would be required to remediate plaintiffs' property. But he intended to use the soil that was on site, as well as on Ryder's property, and so his quote did not include any additional subsoil or topsoil—the $30,750 was for equipment and labor, as well as probably grass seed. David knew of Bruce Waldron and had no issues with his work. David agreed that Waldron's quote of $12.40 for subsoil and $28.40 for topsoil were good quotes. And Waldron's quote that included needing 850 cubic yards of subsoil and 148 yards of topsoil was accurate if he was not taking dirt from Ryder's property.

Defendant Ryder testified that he mistakenly messed up plaintiffs' property and he wanted the opportunity to fix it. That is why he commissioned the engineering plans at a cost of about $2,500 so they could all be on the same page. He did not feel that he should be financially ruined over an honest mistake. To avoid any remediation, he was willing to purchase plaintiffs' property. He knew that David Merchant would be supervising him if he was allowed to remediate plaintiffs' property himself. And he has all of the equipment necessary at his home to perform that task. He thought it would take him about two weeks. But Ryder knew that plaintiffs did not want him to perform the remediation work and they did not want him on their property. Ryder did not believe the quotes presented by plaintiffs were reasonable, particularly the need for fill material because he never removed any dirt offsite—he merely moved it around the property. He cut between five and ten dead ash trees down on the disputed strip of property. The fence that has been referred to was not really a fence—there were posts and some pieces of wire. So if he had to install a fence on plaintiffs' property that would actually be an improvement, not a remediation. Further, he disagreed with the landscaping estimate because he did not remove that many trees—not even close. There was some brush but there was a significant portion that had no trees. "They're asking for trees to be planted in an area that was standing water before I moved the dirt." He would be willing to plant a few trees but not as many as the estimate quoted. Ryder testified that a lot of plaintiffs' property had been wet and had gotten wetter over the years. It was not because of anything he did. He actually tried to improve it so that it was not so wet when he thought it was his property.

At the conclusion of witness testimony and closing arguments, the trial court rendered its opinion on plaintiffs' damages. First, the court reiterated its conclusion that Ryder was liable for trespass, but the trespass was casual and involuntary, i.e., he had probable cause to believe that the land on which the trespass was committed was his own. Second, the court referred to the holding in *Schankin*, 354 Mich at 492, that generally damages for trespass are measured by the difference in the value of the land before and after the harm. The court noted that there was no testimony regarding any difference in the value of the land. But the *Schankin* Court also stated that there is no fixed, inflexible rule for determining damages; thus, the trial court turned to the damages requested by plaintiffs. The court noted that plaintiffs requested $6,444 for a survey, but had already spent $2,094 and an additional $4,350 was needed to complete the survey. The court held that the remaining cost of $4,350 to complete the survey would be split between the parties so that each paid for half, or $2,175. The $2,094 that plaintiffs had already paid was considered "to be a cost of defending this action," and would be addressed later in the ruling. But Ryder was also to pay the cost of recording the appropriate documents with the Register of Deeds associated with the new survey and ensuring title was quieted in plaintiffs' favor.

Next, the trial court denied plaintiffs' request for construction of a fence because what had been on their property was in a state of extreme disrepair. But the court ordered that the cost of staking the land by the surveyor be split between the two parties. The court then considered plaintiffs' request for excavating services. The court noted that the evidence showed that Ryder had not removed any of the dirt from the property, it had merely been moved around. Therefore, the quotes plaintiffs presented that included the hauling in of dirt to plaintiffs' property were inappropriate. David Merchant had testified that the dirt that was already on the property was sufficient to fill in the disputed property. And the court held that Ryder would be given the opportunity to fix plaintiffs' property, with David present to supervise the excavation work. David

must also sign off on the work performed by Ryder, and Ryder must pay any cost associated with David's supervision.

The trial court next considered the issue of landscaping as damages and noted that the court had performed a site visit. The court further noted that, during that site visit in the spring of 2021, the Ryder property was not visible from plaintiffs' land. The court also considered photographs that were admitted as exhibits and concluded that a majority of the property at issue did not contain a large number of hardwood trees before Ryder's trespass. Therefore, the quotes presented by plaintiffs with regard to requested landscaping were designed more to improve the property than to restore the property to its previous state. The court recalled seeing "scrub trees" or trees that were embedded in a swampy area in some places and not mature, high quality trees. Accordingly, the court ordered Ryder to pay, as set forth in the Twin City Landscaping estimate, the cost of installing 21 arrowwood viburnum trees which was $1,995.

As for plaintiffs' request for costs and attorney fees, the trial court noted that MCL 600.2591 provides for an award of cost and fees for a frivolous action. However, the court noted that Ryder reasonably believed the property at issue was his rightful property based on the Tingley survey. Therefore, the court held, each party was to bear the cost of their own defense and prosecution of this matter, including their own attorney fees.

On January 19, 2023, the trial court entered an order following the hearing on damages for civil trespass. The court ordered: (1) a survey to be completed by Gilbert Barish, and the parties shall each pay $2,175 in that regard; (2) defendant Ryder to pay the recording fee associated with the survey; (3) defendant Ryder to perform the remedial excavation with plaintiffs' permission, under the supervision of David Merchant, and at Ryder's cost, and within six months of getting the requisite permission; (4) defendant Ryder to pay the cost of installing 21 Arrowwood Viburnum trees for a total of $1,995; (5) each party to bear their own costs and attorney fees; and (6) a money judgment was entered in favor of plaintiffs and against Ryder in the amount of $1,995.

Plaintiffs appeal, arguing that (1) the trial court erred in awarding only $1,995 in damages—the cost of planting 21 Arrowwood Viburnum trees—when the evidence showed that Ryder destroyed about one acre of plaintiffs' mature woods; (2) the trial court erred in permitting Ryder to perform remedial excavation work instead of awarding damages to plaintiffs for the cost of that work; and (3) the trial court erred in holding that the parties must split the cost of a remedial survey and associated field work to reestablish the appropriate boundary line required to correct the errors created by the Tingley survey.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. MCR 2.613(C); *Ligon v Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2007). A trial court's determination of damages following a bench trial is also reviewed for clear error. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 513; 667 NW2d 379 (2003). Clear error exists where, after reviewing the entire record, the reviewing court is left with a firm and definite conviction that a mistake has been made. *Walters v Snyder*, 239 Mich App 453, 456;

608 NW2d 97 (2000). But to the extent that the proper measure of damages involves a question of law, our review is de novo. See *2000 Baum Family Trust v Babel*, 488 Mich 136, 143; 793 NW2d 633 (2010); see also MCL 600.2919(1). This Court is deferential to the trial court's special opportunity to judge the credibility of the witnesses. MCR 2.613(C); *Smith v Straughn*, 331 Mich App 209, 215; 952 NW2d 521 (2020).

## B. APPLICABLE LAW

MCL 600.2919(1) provides:

Any person who:

(a) cuts down or carries off any wood, underwood, trees, or timber or despoils or injures any trees on another's lands, or

(b) digs up or carries away stone, ore, gravel, clay, sand, turf, or mould or any root, fruit, or plant from another's lands, or

(c) cuts down or carries away any grass, hay, or any kind of grain from another's lands

without permission of the owner of the lands . . . is liable to the owner of the land . . . for 3 times the amount of actual damages. If upon the trial of an action under this provision or any other action for trespass on lands it appears that the trespass was casual and involuntary, or that the defendant had probable cause to believe that the land on which the trespass was committed was his own . . . judgment shall be given for the amount of single damages only.

In this case, plaintiffs prevailed in their action to quiet title brought under MCL 600.2932, and thus, were entitled to seek damages for injury to their land under MCL 600.2919(1). But the trial court concluded that Ryder's trespass was casual and involuntary, and that he had probable cause to believe the land at issue was his own based on the Tingley survey; therefore, plaintiffs were only entitled to single damages and not treble damages. That holding has not been challenged on appeal. However, plaintiffs challenge the damages awarded thus we turn to the law on the issue of damages under these circumstances.

It is a well-established principle of law that a plaintiff asserting a claim "has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable. Damages, however, are not speculative simply because they cannot be ascertained with mathematical precision." *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 96; 706 NW2d 843 (2005) (citation omitted). "It is sufficient if a reasonable basis for computation exists, although the result be only approximate." *Berrios v Miles, Inc*, 226 Mich App 470, 478; 574 NW2d 677 (1998).

In the case of trespass and injury to land, our Supreme Court in *Kratze v Independent Order of Oddfellows, Garden City Lodge No 11*, 442 Mich 136, 149; 500 NW2d 115 (1993), stated:

Where the wrong consists of a trespass to property resulting in an injury to the land, the general measure of damages is the diminution in value of the property if the injury is permanent or irreparable. If the injury is reparable, or temporary, the proper measure of damages is the cost of restoration of the property to its original condition, if less than the value of the property before the injury. The rule is, however, flexible in its application. The ultimate goal is compensation for the harm or damage done. Thus, whatever method is most appropriate to compensate a plaintiff for the loss may be used. [*Id*. (citations and footnote omitted).]

In other words, there are two methods that may be used to determine damages for the injury to land: the injured party may seek compensation for the lost market value of the land, i.e., the diminution in value method, or the injured party may seek the cost of restoration of the land, i.e., the restoration method. That is so because, while the property's value may not have been diminished by the injury (and may actually have been enhanced), that property may have had a unique value to its owner that was negatively impacted. For example, the property may have been purchased or particularly enjoyed because of the beauty of its trees that were wrongfully cut down.

Consequently, our Supreme Court in *Schankin v Buskirk*, 354 Mich 490, 494; 93 NW2d 293 (1958), had previously recognized that "there is no fixed, inflexible rule for determining, with mathematical certainty, what sum shall compensate for the invasion of the interests of the owner. Whatever approach is most appropriate to compensate him for his loss in the particular case should be adopted." Likewise, in *Thiele v Detroit Edison Co*, 184 Mich App 542, 545; 458 NW2d 655 (1990), this Court had also noted that "courts should apply whatever approach is more appropriate to compensate the plaintiff for the losses incurred based on the facts of the individual case," and concluded in that case that the "loss of aesthetic value, the actual monetary value of the trees lost and the cost of their replacement constitute[d] evidence of the diminution in value of the freehold estate." However, as this Court noted in *Szymanski v Brown*, 221 Mich App 423; 562 NW2d 212 (1997), while it is permissible to apply the restoration method of computing damages to which the injured party is entitled, those damages "must not exceed the value of the property before the injury." *Id*. at 430-431, citing *Kratze*, 442 Mich at 149. Therefore, in *Szymanski* the defendant— who had "destroyed more than five hundred mature trees, removed topsoil, and otherwise scarred the earth"—was entitled to remittitur in the amount of $9,500 because the jury's award of $37,000 exceeded the market value of the property, which was $27,500. *Id*. at 426, 431-432.

## C. APPLICATION OF LAW TO THE FACTS

Plaintiffs argue on appeal that the trial court erred in awarding only $1,995 in damages— the cost of 21 arrowwood viburnum trees—when the evidence demonstrated that Ryder excavated and destroyed about one acre of plaintiffs' mature woods. We disagree.

Plaintiffs assert that they presented evidence substantiating their request for damages in the range of $151,355 to $200,145, which included remedial excavation and landscaping, a survey, new fencing, and attorney fees and costs. Nevertheless, plaintiffs argue, the trial court only awarded the cost of installing 21 arrowwood viburnum trees—which was $1,995.

As the trial court noted, plaintiffs did not present any evidence as to the diminution in value of their property resulting from Ryder's actions. In other words, plaintiffs did not seek damages

for the lost market value of their land. No evidence was presented in that regard. Rather, plaintiffs sought damages for the cost of restoration of their property as evidenced by the estimates for remedial excavation and landscaping submitted, as well as witness testimony in support of those estimates and plaintiffs' loss. However, as our Supreme Court held in *Kratze*, "the proper measure of damages is the cost of restoration of the property to its original condition, *if less than the value of the property before the injury*." *Kratze*, 442 Mich at 149 (emphasis added); see also *Szymanski*, 221 Mich App at 430-431. Plaintiffs did not present any evidence as to "the value of the property before the injury." But in the bench trial, Douglas Merchant, the assessor and supervisor of Arcadia Township, testified that the value of agricultural property in 2022 was about $5,450 an acre and a residential wooded lot was about $3,500 to $3,800 an acre. The property that was allegedly damaged by Ryder's actions was a 31-foot-wide strip of land that amounted to a bit less than one acre of land. Accordingly, plaintiffs could not have been entitled to the amount of restoration damages they sought, as set forth in their memorandum of law submitted before the evidentiary hearing on damages, i.e., excavation work totaling between $66,414 to $81,550, and landscaping work totaling between $30,151 to $58,005. The value of the disputed property, at most, was about $5,450, according to the record evidence.

Further, with regard to plaintiffs' landscaping estimate, plaintiffs failed to present evidence as to the number, types, sizes, and condition of trees that Ryder removed from their property—despite claims that a "mature woods" was cut down. Plaintiffs' landscaping expert, Hahn, admitted that he had never been to plaintiffs' property before the damage had occurred, and thus, he was relying on plaintiffs' representations as to what had been on the property. And Hahn did not testify that he saw a large number of stumps from mature trees having been cut down on the property, i.e., evidence that an acre of mature woods was cut down as plaintiffs had claimed. Waldron, plaintiffs' excavation expert, also did not testify that he saw evidence that an acre of mature woods was cut down on the property. Ryder admitted to cutting down between five and ten dead ash trees, removing thick underbrush, and moving dirt from high to low spots because some of the disputed property was low-lying and very wet. The trial court noted that, at its site visit to the property, "scrub trees" or trees that were located in swampy areas—and not mature or high-quality trees—were seen on plaintiffs' property. And the photographs that had been admitted as exhibits, the court noted, also showed that a majority of the property at issue did not contain a large number of hardwood trees before Ryder's actions. Moreover, while plaintiffs had testified that they could see into Ryder's property because of the number of trees that he had cut down, the trial court noted that—at its site visit—Ryder's property could not be seen from plaintiffs' property. In summary, plaintiffs failed to prove, with reasonable certainty, entitlement to damages for about an acre of "mature woods" that was allegedly cut down. See *Health Call of Detroit*, 268 Mich App at 96.

And, with regard to plaintiffs' excavating estimate—particularly as to the expense of subsoil and topsoil, plaintiffs' excavation expert, Waldron, admitted that he had never been to plaintiffs' property before the damage had occurred and was relying on plaintiffs' representations as to the grade, slopes, and elevations of the property. Ryder admitted to moving dirt from high to low spots because some of the disputed property was low-lying and very wet, but he testified that no dirt was removed offsite. And Ryder commissioned a topographic survey at a cost of about $2,500 so that there would be a detailed guide to restore the disputed property back to previous grades and slopes. David Merchant testified that, while subsoil and topsoil would be required to remediate plaintiffs' property, it existed onsite—either on the disputed property or on Ryder's property—and would be a sufficient amount to complete the work. Plaintiffs presented no

-11-

evidence to suggest that Ryder removed the dirt to another location inaccessible for remediation work.

Considering the record evidence, we cannot conclude that the trial court clearly erred in holding that plaintiffs' excavation estimate was inaccurate for including the cost of hauling in topsoil and subsoil—over $50,000. Further, we cannot conclude that the trial court clearly erred in holding that plaintiffs were entitled to the cost of 21 arrowwood viburnum trees, which was $1,995, in damages for restoration of the property at issue. Plaintiffs request for damages in the amount of more than $66,000 for remedial excavation work and up to almost $60,000 for remedial landscaping work was unsupported by the record evidence and far exceeded the value of the property according to the record evidence.

We also reject plaintiffs' argument that Ryder should not be permitted to perform the excavation work, as ordered by the trial court. While this remedy is a bit unconventional, it appears to be the best solution under the circumstances presented in this case. The record evidence demonstrated that Ryder has both the equipment and expertise to perform the remediation work. But to confirm that the work is done properly, the court ordered that excavation expert, David Merchant, whom both parties know, supervise and sign off on the remediation work performed by Ryder. And to ensure that plaintiffs' property is restored properly, Ryder has the topographic survey, which provides a detailed guide to put plaintiffs' property back to previous grades and slopes. David Merchant testified that his quoted estimate to conform to that topographic survey, or to "build to the print," totaled $30,750—and that was for equipment and labor, only. Ryder would be providing that equipment and labor free of charge and under the direct supervision of an expert excavator, at Ryder's cost, who must report to the trial court that the work was done properly. And, again, the damages that could be awarded to plaintiffs for the restoration of their property cannot exceed the value of that property before the injury. See *Kratze*, 442 Mich at 149; *Szymanski*, 221 Mich App at 430-431. Consequently, not only would Ryder's excavation work in remediation of this property be the most cost effective, it is the only manner by which the property could be fully remediated through this litigation under the facts of this case considering the constraints of the applicable damages law. Of course, plaintiffs may choose to decline this award by the trial court and do nothing or arrange for remediation at their own cost. Therefore, under the circumstances presented in this case, we cannot conclude that the trial court clearly erred by ordering Ryder to perform the remediation work on plaintiffs' property under the supervision of David Merchant.

Finally, plaintiffs argue that the trial court erred in holding that the parties must split the cost of a remedial survey and associated field work to reestablish the appropriate boundary line required to correct the errors created by the Tingley survey. We disagree.

The trial court's decision to split the cost of a remedial survey between the parties arises more directly from plaintiffs' action to quiet title brought under MCL 600.2932(1), and not from their trespass action brought under MCL 600.2919(1) for damage to plaintiffs' land. An action to quiet title is equitable in nature. MCL 600.2932(5). And here, as in the *Kratze* case, the expense to be incurred for the cost of a remedial survey was not caused by Ryder's trespass; rather, it was caused by the erroneous Tingley survey which was drafted by William Tingley. See *Kratze*, 442 Mich at 152. Defendant Ryder was no more at fault for the erroneous survey than plaintiffs—both were innocent parties in this regard. Although Ryder hired Tingley—who had been a surveyor

-12-

since 1970—to conduct the survey, there was no evidence that Ryder had any involvement in the manner or methods Tingley employed in that regard. Under these circumstances we cannot conclude that the trial court clearly erred in holding that the parties must split the cost to reestablish the appropriate boundary between their properties. "A trial court must be accorded considerable latitude in fashioning remedies commensurate with the equities of the case." *Governale v City of Owosso*, 59 Mich App 756, 762; 229 NW2d 918 (1975).[2]

In summary, it appears that the trial court was fully aware of the issues presented in this case, correctly applied the law, and awarded damages consistent with the record evidence. See *Alan Custom Homes, Inc*, 256 Mich App at 516 (citation omitted). Accordingly, we affirm the trial court's decision.

Affirmed.

/s/ Anica Letica
/s/ Mark J. Cavanagh
/s/ Brock A. Swartzle

---

[2] Cases decided before November 1, 1990 are not binding precedent but they may be considered persuasive authority. *In re Stillwell Trust*, 299 Mich App 289, 298-299 n 1; 829 NW2d 353 (2012), citing MCR 7.215(J)(1).